**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-01521

AMERICAN CRICKET PREMIER
LEAGUE, LLC,

     Plaintiff,

v.

USA CRICKET, a Colorado Non-Profit
Corporation, INTERNATIONAL CRICKET COUNCIL,
WILLOW TV, INC., PARAAG MARATHE,
AVINASH GAJE, VENU PISIKE, ATUL RAI,
NADIA GRUNY, ERIC PARTHEN, and JOHN DOES 1-10,

     Defendants.

---

### COMPLAINT AND JURY DEMAND

     Plaintiff American Cricket Premier League, LLC ("American Cricket"), by its undersigned counsel, files this Complaint against Defendants USA Cricket, the International Cricket Council Limited ("ICC"), Willow TV, Inc. ("Willow"), Chairman of USA Cricket Paraag Marathe, Avinash Gaje, Venu Pisike, Atul Rai, Nadia Gruny (Gaje, Pisike, Rai, and Gruny are collectively the "Conflicted Board Members"), Eric Parthen, and John Does 1-10 (all collectively, the "Defendants").

### <u>NATURE OF THE ACTION</u>

     1.    This is an action for damages and injunctive relief against Defendants for conspiring to do something they would not tolerate on the cricket playing field (or "pitch")—rigging competition.

2.     Defendants USA Cricket and ICC—respectively the U.S. national and global governing bodies of cricket—are the exclusive gatekeepers of the professional cricket league market in the United States.  Without their imprimatur, no cricket league will have the legitimacy and international support necessary to survive and thrive in the United States.

3.     But while fair play and following the rules are requirements on the cricket pitch (*see* ICC Code of Ethics § 1.1.1) ("Cricket is renowned for strong ethical values of fair play and sportsmanship and the International Cricket Council (ICC) aspires to the highest ethical standards in its governance and administration of the sport."), Defendants USA Cricket and ICC, with assistance from Defendants Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and the John Does, have dispensed with those requirements when selecting a private company to create and operate a professional cricket league and hold matches sanctioned, governed, and regulated by the ICC in the United States.  The Defendants have illegally corrupted competitive processes through unbridled acts of favoritism, payoffs, ignoring or changing procedures without notice, and other self-interested acts of chicanery and corruption that have both excluded Plaintiff American Cricket from, and harmed, the development of professional cricket matches in the United States, all to the detriment of U.S. consumers.

4.     Defendants USA Cricket and ICC claim to have held a fair and open bidding process to select a commercial partner to create and operate a professional cricket league in the United States, but the reality is far different.  USA Cricket and ICC set up the rules of the bidding process to ensure the exclusion of American Cricket.  To further that goal, USA Cricket and the Conflicted Board Members conspired with Willow, a television broadcaster of cricket in the United States and Canada, to ensure the selection of American Cricket Enterprises Inc. ("ACE"),

an entity that is run by the founder and CEO of Willow and Satyan Gajwani and Vineet Jain, principals of The Times Group of India, as quickly as possible and after only a minimal review of the other proposals.

5.      Upon information and belief, Willow-backed ACE offered an objectively inferior proposal to that which American Cricket—and possibly other bidders—submitted.  The selection of Willow-backed ACE by Defendants USA Cricket and ICC is not surprising, however, given their expressed bias against American Cricket and one of its principals, Jay Pandya, as well as the numerous conflicts of interest between USA Cricket, Willow, and the Conflicted Board Members. For example, Willow recently provided massive amounts of free in-kind advertising to the Conflicted Board Members when they were candidates for the Board of Directors of USA Cricket, which enabled them to win their elections.  After each of the Conflicted Board Members won their elections, they were asked to vote on ACE's Willow-backed proposal and, in effect, return the favor.  They also knew that they would need Willow's continued support to remain in office and win reelection at the ends of their respective terms.  Moreover, ACE's other backers are the principals of The Times Group of India, a major media partner of the ICC in India and a key sponsor of ICC-sanctioned events in India and elsewhere.

6.      The rushed and conflicted bidding process robbed American Cricket of an opportunity to compete fairly for the right to make an ICC-sanctioned cricket league a reality in the United States.

7.      American Cricket knows it was not guaranteed to be selected as a commercial business partner of USA Cricket and the ICC.  But it was entitled to a fair bidding process. However, this is not just a case about harm to American Cricket.  This is a case about the most

egregious type of foul play in the American economy—harming fair competition and the chance to succeed on the merits. By conspiring to create, and gain personal benefit from, a rigged bidding process, Defendants have robbed American cricket enthusiasts, sponsors, and competitors of what a fair competitive bidding process is supposed to produce—better quality, lower prices, more innovation, and more output, all to benefit the sport of cricket. American Cricket and supporters of cricket in the United States deserve better. This Court must blow the whistle on such conduct.

8.      American Cricket thus brings this Complaint for relief under the federal Sherman Antitrust Act (for both an agreement in restraint of trade under Section 1 and a conspiracy to monopolize under Section 2) (Counts One and Two), the Colorado Antitrust Act (Count Three), California's Cartwright Act (Count Four), California's Unfair Competition Law (Count Five), and various state law claims concerning tortious interference with business relations (Count Six), tortious interference with contract (Count Seven), and civil conspiracy (Count Eight).

## PARTIES

9.      Plaintiff American Cricket is a Delaware Limited Liability Company with its principal place of business located at 9101 Alta Drive, Suite 1801, Las Vegas, Nevada 89145.

    a.  One of American Cricket's principals, Jay Pandya, is an experienced businessperson and cricket executive. He is the owner of the St. Lucia Stars, a professional cricket team in the Caribbean Premier League, and chairman of Global Sports Ventures ("Global" or "GSV"), a company that was previously involved in the commercial development of cricket properties.

    b.  American Cricket is also led by Steven Maksin. Mr. Maksin is the founding member of Moonbeam Capital Investments LLC, a private equity fund whose

affiliates own and manage a real estate portfolio including over 10 million square feet of residential, commercial, retail, office, and hotel space across 20 states nationwide.  Mr. Maksin's oversight includes the acquisition of distressed properties and non-performing loans; property management and redevelopment; expanding Moonbeam's alliances with industry and strategic partners; and interfacing with financial institutions and investors.  Mr. Maksin's real-estate experience is an unparalleled asset to American Cricket's robust infrastructure and stadium-development capabilities.

10.     Defendant USA Cricket is a Colorado non-profit corporation with its principal place of business located at 1530 South Tejon Street, Colorado Springs, Colorado 80905.

11.     Defendant ICC is a British Virgin Islands corporation with its principal place of business located in the City of Dubai, United Arab Emirates, at Street 69, Dubai Sports City, Sheikh Mohammed Bin Zayed Road, Dubai, PO Box 500 070, UAE.

12.     Defendant Willow is a Delaware corporation with its principal place of business in Sunnyvale, California.  Willow is a leading television broadcaster of international cricket matches in the United States.  It operates as a subsidiary of Times Internet Limited, which is the digital arm of The Times Group of India, the largest media conglomerate in India.

13.     Defendant Paraag Marathe is the Chairperson of USA Cricket and an Independent Director on the USA Cricket Board of Directors.  Chairman Marathe is also the Executive Vice President of the San Francisco 49ers professional football franchise and conducts USA Cricket business from his office in Santa Clara, California.  Upon information and belief, Chairman Marathe is a resident of Los Altos, California.

14.     Defendant Avinash Gaje is an Individual Director on the USA Cricket Board of Directors.  Upon information and belief, Gaje is a resident of Monmouth Junction, New Jersey.

15.     Defendant Venu Pisike is an Individual Director on the USA Cricket Board of Directors.  Upon information and belief, Pisike is a resident of Cumming, Georgia.

16.     Defendant Atul Rai is the League Director on the USA Cricket Board of Directors.  Upon information and belief, Rai is a resident of Santa Barbara, California.

17.     Defendant Nadia Gruny is the Female Player Director on the USA Cricket Board of Directors.  Upon information and belief, Gruny is a resident of Davie, Florida.

18.     Defendant Eric Parthen is employed by Defendant ICC as the USA Project Manager and conducts business on behalf of the ICC primarily from USA Cricket's office in Colorado Springs, Colorado.  Upon information and belief, Parthen is a resident of Colorado Springs, Colorado.

19.     Defendants John Does 1-10 are individuals and/or entities, including officers, directors, agents, and/or employees of the other Defendants, whom American Cricket believes may have engaged in the activities discussed herein and about which more detail may become available to American Cricket through additional investigation and discovery.  American Cricket expressly reserves the right to add specific individuals and entities as Defendants to this action.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and the parties are

diverse.  This Court has supplemental jurisdiction over American Cricket's state-law claims under 28 U.S.C. § 1367(a).

21.     This Court has personal jurisdiction over Defendants because they have continuous and systematic contacts with this forum as a result of regularly conducting business activities within the State of Colorado and the District of Colorado ("this District"), including but not limited to invocation of the liability limitations and corporate governance provisions of Colorado Revised Statutes by USA Cricket as a domestic corporation, and the other Defendants' business dealings with USA Cricket.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to American Cricket's claims occurred in this District.

## FACTUAL ALLEGATIONS

23.     American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

### The T20 Cricket Revolution

24.     Cricket is a thriving sport in many countries around the world.  It is an athletic contest featuring two teams of 11 players using bats and balls that traces its origins to 16th Century England and grew with the expansion of the British Empire.  A 2018 ICC market research project found that there are more than a billion cricket fans worldwide, and each year cricket events set new records for ratings and viewership.

25.     Cricket's flourishing popularity, both in the United States and internationally, stems directly from the emergence of Twenty20 (or "T20") cricket.  T20 cricket was designed in the mid-

2000s as a faster-paced, flashier version of the game, with a focus on individual players, high-scoring excitement, and celebratory fanfare. T20 games are played by sponsored, franchised teams with players of different nationalities, and often feature in-game musical performances and fireworks displays. In short, T20 cricket was made for, and has been successful in, prime-time television broadcasts that attract advertisers and fans.

26.      The T20 format has become the most popular professional version of the sport primarily because it allows for a single contest to be played efficiently in about three hours, like most other major professional team sports. The other formats of professional cricket—Test matches (lasting 5 days) and One-Day Internationals (lasting on average more than 8 hours)—run far too long to be commercially viable in the United States.

27.      T20 has enjoyed rapid, worldwide success. In the past decade, over a dozen T20 leagues have emerged around the world, led by the Indian Premier League, the most attended cricket league in the world. In 2017, the Indian Premier League's broadcasting and digital rights for the next five years were sold for $2.55 billion. And, as of 2018, the Indian Premier League had a brand value of $6.3 billion. In light of T20's global success, the T20 format has been proposed as an Olympic sport.

28.      The United States is home to approximately 20 million cricket enthusiasts and is second only to India in pay-per-view and online cricket viewers. The United States boasts the world's biggest sports market, and cricket power brokers have long viewed the United States as an untapped gold mine. Cricket is on the verge of taking off in the United States; the United States promises to be one of the most fertile and lucrative cricket markets anywhere in the world.

American cricket fans, sponsors, and competitors are waiting to capitalize on and enjoy this impending growth.

29.     The key to creating a robust T20 cricket market in the United States is the same as in countries where cricket is already an established sport: a professional league, complete with franchised teams, accomplished athletes, modern fields and stadiums, intra-league matches, broadcasting and sponsorship rights, and championships just like any other major sport.

30.     ICC recognition is crucial for any professional cricket league to be viable and internationally recognized.  The ICC organizes and governs cricket's major international tournaments, supplies millions of dollars in tournament prize money (including, for example, $14 million in prize money for the 2019 ICC Cricket World Cup, more than any other cricket tournament to date), attracts lucrative international and domestic sponsorship deals, oversees player development, including in youth and women's leagues, establishes the sport's Code of Ethics, and is accepted worldwide as the sport's governing body.  As of January 1, 2019, each of the 104 member nations of the ICC has a national governing organization that is authorized to sanction T20 matches.  Geoff Allardice, the ICC's General Manager of Cricket, has publicly stated that "any [cricket] tournament would need both the support of the home country [governing body] and the ICC."

31.     In fact, 15 years ago, an eight-team T20 professional league called Pro Cricket that was not ICC-sanctioned was launched in the United States, but the league folded after just one season.

32.     Players that want to compete in ICC-sanctioned international events, or for any of the other ICC-sanctioned events, will not participate in a league that is not sanctioned by the ICC

because they risk losing their ability to play in future ICC matches.  This is not a hypothetical.

From 2007 to 2009, a T20 league in India, called the Indian Cricket League ("ICL"), operated

without ICC recognition.  Players who joined the ICL risked being banned from international play

by their ICC-affiliated governing bodies.  An October 2008 article in the British newspaper the

Telegraph reported that "[a]ny player signing up with the ICL, a Twenty20 league that does not

have official status from the International Cricket Council, risks losing their registration with the

[England & Wales Cricket Board]."  (Exhibit A.)  Similarly, a September 2008 BBC article

reported that the Bangladesh Cricket Board "threatened to ban any player joining the unsanctioned

Indian Cricket League from international play for 10 years."  (Exhibit B.)

**American Cricket's Predecessor-in-Interest Wins Development Rights for a Professional T20 Cricket League in the United States**

33.     The ICC currently represents 104 national governing bodies, drawn from five

regions: the Americas, Africa, Europe, Asia, and the East-Asian Pacific region.  The ICC

designates a governing body in each country to oversee development of the sport of cricket and to

retain the exclusive rights to promote events sanctioned by the ICC in that country.

34.     In 1965, the United States of America Cricket Association ("USACA") joined the

ICC as the body responsible for promoting and regulating cricket in the United States.  USACA

served in that capacity until its expulsion from the ICC in 2017.

35.     Against the backdrop of the T20 format's enormous international success, in or

around September 2016, USACA announced plans to launch a T20 professional cricket league in

the United States.

36. In connection with this effort, USACA selected Global, an entity formed by Mr. Pandya, as its partner to do the commercial development work necessary to establish and operate the professional U.S. T20 cricket league (the "Global T20 League").

37. On or around September 29, 2016, Global agreed to pay approximately $70 million to enter into a license agreement with USACA through which USACA conveyed to Global certain rights and benefits USACA held from the ICC (the "License Agreement").  (Exhibit C.)

38. The License Agreement provides that Global "wishes to establish a professional cricket league to compete in the sport of cricket in the 'T20' format of play, or any format of play developed after the date hereof that is derivative of the T20 format . . . , with teams consisting of national and international players, including players who currently are on the roster of national cricket boards . . . ."

39. The License Agreement granted to Global, among other things, "the exclusive right and license . . . to establish, promote, conduct and otherwise commercialize" the Global T20 League "as the only USACA sanctioned and ICC approved professional T20 league" (the "Licensed Rights").

40. Because USACA entered into the License Agreement with Global while USACA was temporarily suspended from the ICC (for reasons not associated with Global in any manner), the License Agreement provides that the Licensed Rights, among other rights, would not become effective "unless and until the Suspension (as defined below) is lifted, terminates or otherwise ends (the "ICC Reinstatement") and the ICC shall have approved USACA's grant of such rights to GSV hereunder . . . ."

41.     The License Agreement defines "Suspension" as the "ICC's suspension of those rights that ICC previously granted to USACA with respect to its ICC membership under the ICC Rules and Regulations."

42.     The License Agreement also contains a provision concerning Global's rights in the event the ICC terminated USACA's membership.  That provision states:  "Upon the termination of this Agreement on account of the suspension o[r] termination of USACA's membership with ICC, USACA shall cause ICC or ICC's nominated body for the development of cricket in USA, to execute the necessary agreements which shall have the effect of providing or continuing, as the case may be, the Licensed Rights to GSV, such that GSV's rights under this Agreement are not jeopardized in the event of suspension o[r] termination of USACA's membership with ICC" (the "Continuing Rights").

43.     Following USACA's selection of Global as its partner to launch the Global T20 League, Global announced plans to spend approximately $2.4 billion on building new cricket stadiums and related infrastructure in New York, New Jersey, Washington, D.C., Georgia, Florida, Illinois, Texas, and California, which is more than double what ACE committed to invest nearly three years later.  Global also began lining up franchises, negotiating major television and sponsorship deals, assigning player contracts, and identifying third-party vendors in connection with its planned U.S. T20 league.

**ICC Moves to Exclude Global from Involvement in a Cricket League in the United States**

44.     Unbeknownst to both USACA and Global at the time, the ICC had no interest in allowing Global's or Mr. Pandya's involvement in a U.S. T20 league.  The ICC knew, however, that given Global's contract with USACA, if the ICC were to reinstate USACA, the ICC would

not be able to prevent Global, or Mr. Pandya, from playing a significant role in the future of an ICC-sanctioned T20 league in the United States.

45.     The ICC's desire to exclude Global and Mr. Pandya is based in large part on the fact that Mr. Pandya is not part of the incumbent and traditional Indian business and social circles that dominate Indian cricket and the ICC worldwide.  Mr. Pandya and his family are not part of the elite political, business, and governmental castes in India that control the ICC through their official and unofficial positions of influence.  He and his family are not affiliated with The Times Group, an Indian media conglomerate with close ties to the ICC as a sponsor and promoter of cricket.  And he and his family are not part of the entrenched cricket power structure that has dominated the ICC and its sponsored entities for decades.

46.     In response to the agreement between USACA and Global, ICC leaders undertook several steps to interfere with the License Agreement and to prevent Global from obtaining the Licensed Rights so the ICC could anoint someone else.  Although the ICC had already suspended USACA at this point, up until Global purchased the Licensed Rights, the ICC had been negotiating in good faith without imposing onerous or insurmountable conditions.

47.     After Global purchased the Licensed Rights, the ICC placed numerous new conditions on lifting USACA's suspension—including the radical requirement that USACA adopt an ICC-drafted constitution (which is not what is required of the ICC's other 103 members)—in an attempt to legitimize its effort to expel USACA and to prevent Global from obtaining the Licensed Rights.  The new conditions imposed by the ICC were arbitrary, designed to be nearly impossible for USACA to comply with and were intended solely to justify ICC expelling USACA and thereby excluding Global from the T20 cricket market in the United States.

48.     In response to the conditions the ICC imposed upon USACA, Mr. Pandya requested, and was granted, a meeting with ICC Chairman Shashank Manohar in London to discuss Global's purchase of the Licensed Rights and the possibility of a future relationship with the ICC to develop the T20 league in the United States that was not to be fully contingent on the status of USACA.  At that time, Mr. Pandya was unaware of the ICC's animosity towards him and its desire to exclude Global from the T20 cricket market in the United States.

49.     During the London meeting, Mr. Manohar made it clear that the ICC had no interest in working with any entity associated with Mr. Pandya for the reasons identified above.  Despite being a successful businessperson with a passion for cricket, he was not affiliated with one of the favored, elite incumbents that dominated the sport of cricket.  The ICC made it clear to Mr. Pandya that under no circumstance will the ICC allow any entity associated with him to participate in the creation of an ICC-sanctioned league in the United States.  And it was not so subtly pointed out to Mr. Pandya that other well-heeled business people have failed to develop their cricket business after the ICC refused to recognize them.

**The ICC Expels USACA and Creates the ICC Americas Project USA Team**

50.     In or around June 2017, after Mr. Pandya made it clear to the ICC that Global was not going to abandon its relationship with USACA and intended to continue its pursuit of the development rights for a T20 league in the United States, the ICC formally expelled USACA from its membership, ending a 52-year association between the two organizations.

51.     The ICC expelled USACA from its membership in large part to prevent the License Agreement from going into effect—and thus to prevent Global from automatically obtaining the

Licensed Rights—so that it could ensure that no entity associated with Mr. Pandya was involved with the creation and operation of a professional T20 cricket league in the United States.[1]

52.     In furtherance of that effort and to wipe the slate clean, the ICC created the ICC Americas Project USA team to lead the development of a new governing body for cricket in the United States.  The ICC also formed a series of advisory groups (the "Local Advisory Groups") to assist the ICC Americas Project USA team in developing a new governing body for cricket in the United States.  One of the Local Advisory Groups was the Sustainable Foundation Advisory Group (the "SFAG"), which provided advice, support, and guidance to the ICC Americas Project USA team.

53.     Specifically, the ICC charged the SFAG with assisting the ICC Americas Project USA team with, among other things, (i) developing and recommending for approval the content of a constitution for the anticipated new governing body, which would become USA Cricket; (ii) developing and assisting in the implementation of a communications plan around the release of the new constitution and the subsequent election process for USA Cricket's Board of Directors; (iii) identifying individuals to sit on USA Cricket's initial Nominating and Governance Committee for the purposes of the initial Board of Directors elections; (iv) developing a process to support the building of a membership base and the staging of elections for all Board of Directors positions for USA Cricket; and (v) assisting the Nominating and Governance Committee in identifying Independent Directors to serve as candidates for the new Board of Directors.

---

[1] Global has subsequently transferred all of the Licensed Rights granted under the USACA Licensing Agreement to American Cricket.

54.     According to publicly available documents, the ICC and the ICC Americas Project USA team pledged their full support to the SFAG.

**The ICC Creates USA Cricket**

55.     In conjunction with the ICC's expulsion of USACA from its membership, the ICC Americas Project USA team and the ICC quickly laid the groundwork for establishing USA Cricket as USACA's ICC-endorsed replacement.

56.     In or around September 2017, just three months after USACA's expulsion, USA Cricket announced in a press release the launch of its branding and social media platforms.  The press release included a quote from ICC employee Defendant Parthen, stating that this launch "is the first step towards getting a new Governing Body up and running."

57.     Three months later, in or around December 2017, USA Cricket announced that the SFAG had formally approved USA Cricket's constitution, a necessary pre-requisite for USA Cricket to become the new governing body for ICC-sanctioned cricket in the United States.

58.     In or around February 2018, USA Cricket launched its official membership program.  The press release announcing the membership program described it as "the next step in the process to build a world-class U.S. governing body for cricket [that] will help facilitate a fair and transparent election process that engages the entire U.S. cricket community and unifies the sport moving forward."  The press release also stated that "USA Cricket membership would be able to vote on seven (7) of the ten (10) Board members," and that the "new USA Cricket Board of Directors is expected to be in place by May 2018."  In addition, the press release included a quote from ICC employee Defendant Parthen, stating that the membership program "marks one of

the most crucial steps in the process for the establishment of a governing body that will engage everyone involved in the U.S. cricket community."

59.     Upon information and belief, the ICC provided, and continues to provide, nearly all the funding necessary to establish, promote, and operate USA Cricket.

60.     Upon information and belief, the ICC also provided, and continues to provide, logistical and administrative support to USA Cricket on a regular basis.  For example, based on publicly available information, the ICC registered USA Cricket's website, www.usacricket.org, and lists itself as the Registrant Contact with a mailing address in Dubai.

61.     Upon information and belief, the ICC uses its own personnel, including but not limited to Defendant Parthen, to conduct ICC business purportedly on behalf of USA Cricket.  In fact, Defendant Parthen conducts ICC business from USA Cricket's office in Colorado Springs, Colorado.

62.     Upon information and belief, USA Cricket could not sustain its operations without the financial, administrative, and logistical support of the ICC.

**USA Cricket Elected its Initial Board of Directors through Willow-Sponsored Campaigns**

63.     In or around April 2018, USA Cricket announced the formation of a four-person Nominating and Governance Committee.  The Nominating and Governance Committee was responsible for, among other things, leading the election process for USA Cricket's Board of Directors, vetting all Board candidates, and identifying and recommending for appointment three independent directors for USA Cricket's Board of Directors.

64.     USA Cricket announced that the ICC Chief Executive at the time, David Richardson, was one of the four members of the Nominating and Governance Committee.

65.     Far from being the representative and fair "fresh start" the ICC had heralded, the campaigns to elect the first Board of Directors of USA Cricket were infected from the start by unethical conduct.

66.     Willow, an entity owned and run by affiliates of the influential Times Group of India (a key sponsor of ICC-sanctioned events in India and elsewhere), worked to ingratiate itself with the ICC and USA Cricket.  On information and belief, it paid for substantially all of the campaign expenses for the Conflicted Board Members.  This included significant amounts of free ad creation and advertising time on Willow's cricket broadcasts in the United States, the only source for broadcasts of ICC-sanctioned events in the U.S.

67.     In or around August 2018, USA Cricket announced the winners of the seven elected seats on USA Cricket's Board of Directors.  The announcement states that the results were validated by the ICC in Dubai.

68.     Each of the four Conflicted Board Members won their contested elections.  And, when combined with the three non-member-elected Board members approved by the Nominating and Governance Committee and selected by the USA Cricket Board of Directors (with the help of the ICC), there was now a clear majority of the Board beholden to ICC-friendly interests.

**USA Cricket Announces United States Professional T20 League RFP**

69.     In November 2018, just three months after solidifying an ICC- and Willow-friendly Board of Directors, USA Cricket announced the United States Professional T20 League RFP (the "RFP"), which sets forth the parameters of USA Cricket's purported competitive bidding process for selection of a commercial partner (the "RFP Bid Process").  (Exhibit D.)  The RFP states that "USA Cricket is looking for a partner to help capitalize on [America's] interest levels in the sport

and, specifically, to construct, fund, launch and operate the first professional T20 cricket league (the "League") in the United States." (*Id.*)

70.     The RFP states: "With the full support of the ICC, USA Cricket has formally applied for membership of the ICC as its recognized National Governing Body for cricket in the U.S.—a process that is expected to be completed in December 2018.  Once complete, USA Cricket will be the sole governing body of cricket in the U.S. that is fully recognized and supported by the ICC and its 104 members around the world." (*Id.*)

71.     The RFP states: "The ICC Board recently approved a transitional plan to support the activities of USA Cricket moving forward and, as part of that plan, has committed to provide financial and human resources, knowledge, expertise, and guidance to USA Cricket across all of its key activities, including the development of this professional T20 league.  As such, this RFP process is fully supported by the ICC." (*Id.*)

72.     The RFP sets forth fifteen topic areas that a party wishing to respond to the RFP (a "Proposer") "should clearly address":

     a.   analysis of prior attempts to establish a professional cricket league in the United States and how the Proposer would plan to use best practices and lessons learned from such events;

     b.   competitive analysis of global T20 leagues and the international and domestic cricket calendar and how the Proposer will use best practices and lessons learned to ensure that the League coexists with (and does not compromise) the vibrancy and health of international cricket;

     c.   short and long term vision and plan for the League;

d.   proposed League structure (e.g., league and team ownership model, duration of League license, teams and facilities, number of matches and structure of the League, strategy for the acquisition and use of foreign and domestic players, etc.);

e.   proposed financial model that will underpin the success of the League including the upfront capital available to start the League and the proposed income streams and operational expenditures of the League and teams, etc.  The model should include a financial and headcount pro forma for the first five years of operation with conservative, balanced, and aggressive forecasts;

f.   proposed League management structure, operational org chart, and comprehensive bios on all management and ownership, including: (i) full details of any litigation brought against any of them in the last 10 years; (ii) all relevant previous experience within professional sport and other relevant professional experience and credentials; and (iii) any actual or potential conflicts of interest;

g.   proposed implementation timeline and optimal timeframe during the year to operate the League;

h.   how the League will assist USA Cricket with the five objectives described in the Project Description and in delivering its purpose set out in Appendix A;

i.   strategy for the support and development of players qualified to play for USA Cricket's national cricket teams, including men's, women's, and youth teams;

j.   strategy for the acquisition and/or use of appropriate training and playing facilities by teams in the League;

k.   media rights valuation and proposed broadcast and digital delivery distribution strategy for the League's content;

l.   commercial rights (excluding media rights) valuation and proposed strategy for the League's content;

m.   additional revenue and/or profit-generating streams beyond League operations;

n.   unique value adds and/or differentiating factors of the Proposer versus other potential operators; and

o.   any other additional content, comments, analysis or proposals that the Proposer would like to be considered as part of their RFP response.

73.   The RFP states that USA Cricket "will consider at least the following factors" when evaluating proposals:

a.   The quality and scope of the Proposer's response;

b.   Creativity reflected in the proposal for unique operational plans and related marketing and promotional ideas to attract new revenue and growth opportunities for USA Cricket;

c.   Proposer's financial condition, ownership structure, and ability to credibly secure and underwrite the costs of the proposal;

d.   Proposer's ability to execute a long term vision and plan; and

e.   Experience / expertise with the commercialization of a sporting property (*e.g.*, production, broadcast, market development, promotion, fan engagement, etc.).

74.     The RFP states that "[a]t any time prior to the date of submission, USA Cricket, at its sole discretion, may amend the terms of the RFP" and that "[a]ny amendments will be notified in writing."

75.     Upon information and belief—and based on the RFP itself—the ICC was materially involved in creating the RFP, executing the RFP Bid Process, and selecting a winner of the RFP Bid Process.   For instance, Defendant Parthen, who was significantly involved with the USA Cricket RFP Bid Process (as further described herein), was and is employed by the ICC and, upon information and belief, informed the ICC about all aspects of the RFP Bid Process and, in particular, the exchanges between USA Cricket and American Cricket relating to the RFP Bid Process (as further described herein).

76.     In addition, email correspondence from Defendant Parthen to American Cricket states that USA Cricket's decisions during the RFP Bid Process "carry the full support of the ICC" and that any actions, legal or otherwise, taken by American Cricket to challenge the RFP Bid Process "would be robustly defended by USA Cricket with the full support of the ICC." (Exhibit E.)  Defendant Parthen's email also states that the ICC "has observed and been consulted on large parts of the [RFP] process"; however, this understates the ICC's role in the RFP Bid Process, as the ICC was involved in every material aspect of the process.  (*Id.*)

**American Cricket's RFP Response**

77.     American Cricket timely submitted its response to the RFP on January 18, 2019 (the "RFP Response").   American Cricket expected USA Cricket to give fair consideration of American Cricket's proposal in order to promote USA Cricket's stated mission, the development of cricket in the United States.

78.     American Cricket's 256-page RFP Response included the following elements, among others, in exchange for the rights to create and operate the League:  (1) $8 million in guaranteed compensation to USA Cricket for each of the first two years and a total of $516 million in guaranteed financial compensation over a period of 25 years; (2) a detailed description of American Cricket's development capabilities for acquiring and building new facilities, including a facility already in development in Dallas, Texas, and one soon to be announced in Atlanta, Georgia; (3) a two percent risk-free equity stake in American Cricket's real-estate development fund, which has a current value of $1 billion (and thus an immediate value to USA Cricket of $20 million); and (4) a plan that would have resulted in at least an additional $2 billion investment to develop the league.

79.     Upon information and belief, Willow-backed ACE, with backing from the founder and CEO of Willow and the principals of The Times Group of India, also submitted an RFP response in January 2019, and USA Cricket began negotiating with Willow-backed ACE almost immediately afterwards.  While USA Cricket was secretly negotiating with Willow-backed ACE, American Cricket was told to wait for a set of standard questions that the USA Cricket Board would ask all bidders, and that the questions would be submitted to all bidders simultaneously once an internal vetting process had been completed.  The USA Cricket Board never submitted any questions to American Cricket.

80.     Instead, American Cricket representatives were invited to make an in-person presentation concerning its proposal to a partial group of the USA Cricket Board.  The meeting lasted approximately 90 minutes, and the USA Cricket Board Members asked only a handful of

questions.  American Cricket was never allowed to meet with the full USA Cricket Board and was never given an opportunity to fully present its proposal.

**USA Cricket Rejects American Cricket's RFP Response and Accepts Willow's**

81.    On March 18, 2019, roughly two months after the RFP submission deadline, Defendant Parthen notified American Cricket by phone and email, purportedly on behalf of USA Cricket's Board of Directors, that USA Cricket had selected another Proposer instead of American Cricket.

82.    USA Cricket provided no detailed explanation of its decision-making to American Cricket and never identified any actual deficiency with American Cricket's proposal.  To the contrary, Defendant Parthen stated in an email dated March 18, 2019, that American Cricket's proposal "was extremely thorough" and "stood out as the only bidder who laid out a comprehensive and elaborate plan to develop mixed-use stadium developments," noting that "[t]his type of infrastructure would be a beacon for professional cricket in the United States." (Exhibit F.)  The email also stated that American Cricket's "assembled team is very impressive, boasting a track record of excellence in their respective fields," and that "[i]t is also beneficial that [the American Cricket team includes members who] previously attempted launching a T20 cricket league."

83.    American Cricket subsequently learned that USA Cricket preliminarily selected Willow-backed ACE as the winner of the RFP Bid Process, and on May 23, 2019, USA Cricket formally announced that it had selected ACE as its strategic partner for the development of a professional T20 league in the United States.  Its press release referenced without any detail that ACE's selection would lead to the investment of more than $1 billion in the development of cricket

in the United States. But USA Cricket failed to mention that American Cricket's RFP submission would have led to more than double that amount being invested.

84. Based on subsequent conversations with individual members of USA Cricket's Board of Directors and other USA Cricket officials that reached out to American Cricket to express concerns about the integrity of the RFP process, American Cricket learned that its RFP Response was superior to every other response on every objective metric and included a far more comprehensive infrastructure and economic development plan than any other Proposer.

85. Specifically, American Cricket was told that the winning bidder, ACE, initially offered far less financial compensation to USA Cricket—a mere $2 million in financial contribution for each of the first two years (hundreds of millions of dollars less over the course of 25 years than American Cricket guaranteed). And ACE's initial proposal had no plans to develop mixed-use stadiums, which has been key to the success of teams in other T20 leagues and other sports.

86. American Cricket also learned from members of USA Cricket's Board of Directors that certain Board members preferred American Cricket's proposal over that of any other Proposer and had wanted USA Cricket to conduct further discussions and negotiations with American Cricket rather than make the rapid award to Willow-backed ACE. But those Board members were denied the opportunity to engage in such discussions with USA Cricket because they were told that the leadership of USA Cricket and the ICC had already decided who was going to win the RFP process. In fact, on information and belief, even before the locked-in ICC majority even formally cast its pre-ordained "vote," one of the Conflicted Board Members was already talking directly to ACE or its principals about assisting as a real estate consultant to develop a stadium

property for ACE for the T20 league (and has continued to do so after ACE was picked).  And at the same time that the RFP process was pending, another member of the USA Cricket Board of Directors, Rohan Sajdeh, was assisting Star TV in regaining the broadcasting rights for ICC-sanctioned events in the United Kingdom, and, in turn, Star TV granted Willow TV distribution rights for ICC-sanctioned events in the United States.

87.     USA Cricket's Constitution provides that each Director and Officer, among others, "shall discharge his or her duties in that position, (i) in good faith; (ii) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; (iii) in a manner maintaining the confidentiality of proprietary and/or confidential information; and (iv) in a manner the individual reasonably believes to be in the best interests of USA Cricket.  (Exhibit G § 14.3.)

88.     USA Cricket's Constitution also provides that "USA Cricket shall adopt a Code of Ethics and Conduct, which shall include a Conflicts of Interest Policy . . . applicable to all USA Cricket members and employees, Board of Directors, Officers, and USA Cricket Committees."

89.     In violation of the USA Cricket Board Members' ethical obligations, as set forth in the USA Cricket Constitution and elsewhere, upon information and belief, no Board Members recused themselves from the RFP Bid Process (other than Defendant Chairman Marathe, who was a senior leader who had already made well known his preference for ACE's Willow-backed proposal) despite clear conflicts of interest involving ACE, Willow and other personal interests.

90.     Based on conversations with some USA Cricket Board members, the reason the Board of Directors did not adequately consider American Cricket's RFP Response was because the Board and the ICC had already pre-determined to accept ACE's bid.  USA Cricket had no

intention to pick any proposal associated with Mr. Pandya, and the entire process was window-dressing intended to create the impression of fair competition.

**USA Cricket Admits It Didn't Really Understand American Cricket's Proposal**

91.     On or about March 20, 2019, American Cricket emailed USA Cricket to find out how USA Cricket could have reasonably selected Willow-backed ACE given the contents of American Cricket's RFP Response and the information American Cricket subsequently learned from certain USA Cricket Board Members and other USA Cricket officials about ACE's submission.

92.     In response, Defendant Chairman Marathe emailed American Cricket and challenged the veracity of American Cricket's financial commitments contained in the RFP Response.  Defendant Chairman Marathe provided no basis or support for his challenge, and none of the concerns had previously ever been expressed to American Cricket.

93.     About two weeks later, it became clear that USA Cricket either did not fully understand, or had intentionally misrepresented, American Cricket's RFP response (or was developing another ruse to deflect attention from their favoritism of ACE and Willow).

94.     Specifically, on April 2, 2019, Defendant Parthen emailed American Cricket about what USA Cricket falsely characterized as new information concerning American Cricket's RFP Response.  The email stated that, "during recent conversations with Mr. Pandya, [USA Cricket's Board of Directors] now understand[s] that your team is prepared to secure the payments to be made to USA Cricket over the term of the proposed license arrangement by way of a bank guarantee."

95.     Yet American Cricket's RFP Response indicated in multiple places that its financial commitments were guaranteed.  This was not new information, and the USA Cricket Board of Directors had clearly not reviewed American Cricket's proposal.  Had USA Cricket devoted any material attention to American Cricket's proposal or inquired about further specifics regarding American Cricket's guaranteed financial commitments during the review process, they would have seen—or American Cricket would have confirmed and explained—the financial commitments of its proposal.

96.     But USA Cricket did not ask American Cricket any follow-up questions or elicit any further information about the RFP Response, or even spend more than 90 minutes with American Cricket or have the full USA Cricket Board meet for any amount of time with American Cricket.  Upon information and belief, USA Cricket did not spend more time with, ask follow-up questions of, or elicit further information from American Cricket because it was understood that the decision had already been made to select Willow-backed ACE.

**USA Cricket Changes the Terms of Engagement for the RFP Process**

97.     In light of this purportedly "new" information about American Cricket's financial commitments, USA Cricket—through ICC employee Defendant Parthen—informed American Cricket that it "decided that it would be appropriate to offer [American Cricket] an opportunity to re-present to the RFP committee in more detail" American Cricket's financial projections and proposed funding mechanisms.

98.     However, this was not truly a desire to re-consider the errors of USA Cricket's ways.  It was, unfortunately, a ruse intended to hide USA Cricket's and ICC's chicanery.  Instead of allowing American Cricket a reasonable opportunity to fully present its proposal, USA Cricket

made the offer to entertain further discussions contingent upon American Cricket signing brand new terms of engagement (the "New Terms of Engagement").  (Exhibit H.)  Upon information and belief, the ICC advised USA Cricket on the drafting and implementation of the New Terms of Engagement to silence American Cricket's justified misgivings about the fairness of the RFP process and decision.

99.     The New Terms of Engagement impose new, extraordinary conditions on the RFP Bid Process that go beyond the scope of the initial RFP.  The New Terms of Engagement thus conflict with the plain language of the RFP, which provides:  "[a]t any time *prior to the date of submission*, USA Cricket, at its sole discretion, may amend the terms of the RFP" (emphasis added).  (Exhibit D at 4.)

100.    For example, the New Terms of Engagement state:  "[b]y participating in the RFP process to date and in any further discussions and/or negotiations with USA Cricket, the Applicant acknowledges and agrees to be bound by and to comply with the terms of the RFP generally . . . as well as, without limitation, the following terms and conditions . . . ." (Exhibit H at 1.)

101.    The New Terms of Engagement also state, in contravention of the RFP, that USA Cricket may "change any aspect of this RFP, issue any separate amendment or addendum to this RFP (which will become part of this RFP upon issue) or withdraw the RFP in its entirety." (*Id.* ¶ 2).

102.    Despite the RFP's clear instruction that USA Cricket "will consider at least the following factors" (Exhibit D at 4), the New Terms of Engagement state that "USA Cricket is not obliged to accept or consider any Proposal in full or in part or any responses or submissions in relation thereto and USA Cricket may reject any Proposal, responses or submissions (or any part

thereof) and, in its sole and absolute discretion, may refuse to award any business in connection with any submission or [sic] the RFP."  (Exhibit H ¶ 3).

103.    Similarly, the New Terms of Engagement state that "USA Cricket may, in its sole and absolute discretion, waive any of the conditions and/or requirements set out in the RFP in respect of any or all of the Applicants."  (*Id.* ¶ 5).

104.    Generally, the New Terms of Engagement purport to, among other things,

    a.    Constitute a release and waiver of all existing and future potential claims against USA Cricket in connection with the RFP bid process;

    b.    Allow USA Cricket in its "sole and absolute" discretion to select a winner without providing any reasons for its decision;

    c.    Allow USA Cricket to reject any proposal in its sole and absolute discretion for any reason or no reason at all;

    d.    Allow USA Cricket to impose other as of yet undisclosed terms and conditions on the RFP bid process in its sole and absolute discretion; and

    e.    Allow USA Cricket to disregard without consideration or explanation all or any portion of responses and submissions in its sole and absolute discretion for any reason or no reason at all.

105.    Given the extraordinary and improper terms proposed by USA Cricket, American Cricket has not signed the New Terms of Engagement.  On April 15, 2019, Defendant Parthen emailed American Cricket and stated that USA Cricket would not engage in any further discussions with American Cricket if American Cricket did not sign the New Terms of Engagement.  (Exhibit I.)

106.    Upon information and belief, USA Cricket asked only American Cricket and ACE to sign the New Terms of Engagement.  According to Defendant Parthen's April 15, 2019, email, ACE signed the New Terms of Engagement.  But Willow-backed ACE was in the catbird's seat given its selection in a biased process by USA Cricket.

107.    Upon information and belief, USA Cricket and the ICC drafted the New Terms of Engagement in response to American Cricket's challenge to the RFP Bid Process.

108.    Upon information and belief, USA Cricket and the ICC sought to use the New Terms of Engagement to coerce American Cricket to give up its rights so that USA Cricket and the ICC can avoid any liability associated with their choice of Willow-backed ACE as the winner of the RFP Bid Process.

109.    Unwilling to surrender its legal rights or endorse an unfair process in order to continue the discussion, American Cricket did not sign the New Terms of Engagement, effectively ending its ability to be formally considered by USA Cricket.  On May 23, 2019, USA Cricket formally announced that it had selected ACE as its strategic partner.

## ANTITRUST ALLEGATIONS

### Interstate Commerce

110.    The activities of USA Cricket, ICC, and the other Defendants referenced herein are in, and affect, interstate commerce.

111.    Many of the activities of USA Cricket, ICC, and the other Defendants referenced herein are in the regular, continuous, and substantial flow of interstate commerce, and have a substantial effect on interstate commerce.

112.     Many of the conspiratorial and anticompetitive acts alleged herein undertaken by the Defendants have, and continue to have, a direct, substantial, and reasonably foreseeable impact on interstate commerce.

**Relevant Markets**

113.     Defendants' conduct has affected interstate commerce in two relevant antitrust markets.  The first relevant product market is the market for the provision of services related to the creation and operation of an internationally recognized professional T20 cricket league sanctioned, governed, and regulated by the ICC (the "League Market").  As described herein, given the commercial realities of the type of cricket matches desired by fans, advertisers, and sponsors, neither another format of cricket nor a league unsanctioned by the ICC are reasonably interchangeable alternatives to a T20 cricket league accredited by the ICC.

114.     A hypothetical monopolist in the market for the provision of services related to the creation and operation of an internationally recognized professional T20 cricket league sanctioned, governed, and regulated by the ICC could implement a small but significant and non-transitory increase in price for such services, which is the hallmark of a properly defined relevant product market under current case law and antitrust guidelines promulgated by the federal antitrust enforcement agencies.

115.     The second relevant product market is the market for the provision of services related to organizing, promoting, administering, and hosting professional T20 cricket matches (the "Match Market").  As described herein, there is no reasonably interchangeable alternative to the products offered in this market.

116.    A hypothetical monopolist in the market for the provision of services related to organizing, promoting, administering, and hosting professional T20 cricket matches could implement a small but significant and non-transitory increase in price for such services.

117.    The relevant geographic market for the provision of services in both the League Market and the Match Market is the entire United States.  This is a distinct area in which a provider of the services in the relevant product markets will provide the services, is where consumers will seek the relevant products, is where advertisers and sponsors will engage in support of the products, and is consistent with the scope of the RFP put forth by Defendants USA Cricket and the ICC.

118.    As the ultimate authorities, with control over the League Market, Defendants USA Cricket and ICC unquestionably possess monopoly power in the League Market in the United States.  In addition, through the exercise of their monopoly power in the League Market, USA Cricket and the ICC have affected and will continue to affect the competitive outcomes in the downstream Match Market including by granting Willow-backed ACE an illegal monopoly in the market.

**<u>Harm to Competition</u>**

119.    The Defendants' anticompetitive conduct described herein has harmed and will continue to harm competition in both the League Market and the Match Market in the relevant geographic area.  Their distortion of the competitive playing field has not only harmed American Cricket (and any other Proposers) but also competition generally, and thus consumers.

120.    By running a sham bidding process in the League market, the Defendants corrupted the competitive process that would have ensured that a bidder possessing top-notch capabilities,

experience, prospects for success, and profitability would be awarded the coveted partnership.  A direct consequence of the Defendants' exercise of their market power in the League market is that the "winning" bidder, Willow-backed ACE, is less qualified to ensure a successful launch of T20 matches in the United States.  As a further direct consequence, there will now be fewer matches offered, the offered matches will be of a lower quality, the matches will be less appealing to cricket fans, and sponsors and advertisers will be less inclined to invest their marketing dollars.  As a result, cricket fans and players will receive an inferior product relative to what they would have enjoyed had the bidding process been fair and unbiased.

121.    Typically, having an RFP process, as happened here, would benefit competition.  But a fundamental underpinning of the federal antitrust laws is that fair competition means legal competition—not cutting corners, cheating, or breaking the law, whether it is price fixing, bid rigging, or other anticompetitive acts.  That is what antitrust law is about:  ensuring that consumers benefit from fair and legal competition on quality, price, innovation, and service.

122.    The antitrust laws do not allow companies to pretend to run a fair bidding process and then reach agreements to steer business to "favored" bidders and unfairly disregard or exclude other bidders—particularly when it is done for self-interested purposes like keeping oneself in a position of authority rather than selecting a proposal that scored higher on all objective measures relevant to the RFP process and the sponsoring organization's stated mission.  Here, a "gatekeeper" monopolist is part of a scheme to do just that.  Despite American Cricket's good-faith effort to present the best RFP response to benefit cricket fans and players in the United States, those groups and all U.S. cricket consumers have been prevented from receiving the benefit of fair competition.  In fact, by selecting ACE's Willow-backed inferior bid, USA Cricket and the ICC, with assistance

from Defendants Marathe, Parthen, the Conflicted Board Members, and the John Doe Defendants, tellingly have acted against their economically rational self-interests in promoting cricket in the United States (instead acting in favor of their personal interests as conspirators).

123.    The end result of this corrupt process is, unfortunately, the loss of the benefits of competition in the markets that would have benefitted consumers of the sports and its business opportunities: more matches, higher quality matches, lower ticket prices, and a better chance of the league's commercial success.

## <u>COUNT ONE</u>

**(Section 1 of the Sherman Act, 15 U.S.C. § 1 against USA Cricket, the ICC,
Chairman Marathe, the Conflicted Board Members, Parthen,
and certain of the John Doe Defendants)**

124.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

125.    USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have entered into a continuing agreement and conspiracy that constitutes an unreasonable restraint of trade, the purpose of which is to eliminate or reduce competition in the League Market by excluding American Cricket and its predecessor-in-interest, Global.

126.    As described herein, USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have repeatedly sought to harm competition in the League Market in the United States by attempting to exclude from it any and all entities associated with Mr. Pandya, including American Cricket and Global, to the detriment of American cricket enthusiasts and commercial supporters of the sport, who would have

benefitted from a more robust and competitive T20 league offering that would have been the result of a free and fair RFP process.  Such economically irrational activity (as it goes against the economic interests of USA Cricket and the ICC that would benefit from the greater growth of cricket as a result of a fair and competitive RFP process) can only plausibly be explained by an anti-competitive conspiracy whose primary objective was to reduce competition and exclude competitors from the market.

127.    First, by agreeing with each other to impair competition and keep out or drive out American Cricket and Global from the League Market by, among other things, designing an RFP process that created the illusion of a free and fair competitive process that actually had a predetermined victor, disregarding American Cricket's more financially remunerative RFP response in favor of a bidder that had explicitly and/or implicitly conspired with USA Cricket Board members including the Conflicted Board Members, immediately beginning direct negotiations with its predetermined victor without fully vetting the other proposals, attempting to change the terms of engagement of the RFP process in a way that would have stripped American Cricket of its rights and ability to challenge the malfeasance of USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, and Parthen, and finally excluding American Cricket from further participation in the RFP process when it refused to accept the New Terms of Engagement, USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have engaged in a *per se* violation under Section 1 of the Sherman Act, 15 U.S.C. § 1, namely a group boycott.

128.    Second, even if such an agreement is not considered a *per se* group boycott in violation of Section 1, the alleged agreement is sufficiently anticompetitive on its face that courts

need only engage in a "quick look" rule-of-reason analysis to find it an unreasonable restraint of trade in the League Market in the United States given the market power of USA Cricket and the ICC.  Because basic economics dictate that creating a phony RFP process with a predetermined victor, disregarding American Cricket's more financially remunerative RFP response, and excluding American Cricket from further participation in the RFP process in favor of a corrupt bidder will distort the competitive process in the League Market in the United States, resulting in severe anticompetitive consequences in the Match Market, the analysis turns to whether USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants can provide any procompetitive justification for their anticompetitive practices.  There are no procompetitive justifications for disregarding a more financially remunerative RFP response, awarding the bid to a conflicted bidder, excluding a bidder from further participation in the RFP process unless it waived its rights to enforce its legal rights, and reducing fair competition in the relevant market.  It was all a shell game to replace competition with a façade that sought to enshrine the conflicted, self-interested, incumbent participants in the sport of cricket and not a newcomer who had credentials and resources.

129.    Third, even absent *per se* or "quick look" treatment, the alleged agreement has distorted and will continue to distort competition in the League Market in the United States, the effects of which are felt most acutely by all participants in the Match Market.  By conspiring to disregard American Cricket's more financially generous RFP response and excluding American Cricket from further participation in the RFP process, USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' agreement harms competition by turning what should be a fair and transparent bidding process into a sham.  The

harm to competition—depriving American cricket enthusiasts of a competitive process to select the most robust and competitive T20 league offering, denying American cricket fans, players, and sponsors access to the most robust T20 matches, and robbing American Cricket (and other Proposers) of fair consideration—satisfies even a full economic rule-of-reason analysis.

130. Under any form of antitrust analysis, the illegal restraints from USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' agreement restricts competition in the League Market in the United States.

131. This agreement between USA Cricket, the ICC, and certain John Doe Defendants restricting competition in the League Market in the United States has no legitimate business purpose or offsetting procompetitive impact.

132. This agreement is a direct and proximate cause of harm to American Cricket because it has allowed others to take business from American Cricket—business that American Cricket would have competed fairly for and secured if it were competing on a legitimate playing field. American Cricket's injury is based on the suppression of competition due to Defendants' unlawful agreement. It is of the type the antitrust laws were intended to prevent and flows from that which makes the relevant Defendants' agreement unlawful.

133. Competition in the League Market in the United States has been and will continue to be restricted by USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' course of conduct, and consumers in the League Market and the Match Market in the United States have been and will continue to be harmed by this reduction in competition, if USA Cricket, the ICC, Chairman Marathe, the Conflicted Board

Members, Parthen, and certain of the John Doe Defendants are permitted to continue their illegal acts described herein.

134.    American Cricket has suffered and will continue to suffer injury as a direct result of USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' unlawful agreement.

135.    American Cricket has suffered and will continue to suffer injury as the direct result of the illegal restraints alleged herein.  Further, the injury American Cricket has suffered as a result of USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' illegal acts constitutes antitrust injury.

## COUNT TWO

**(Section 2 of the Sherman Act, 15 U.S.C. § 2, against USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants)**

136.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

137.    In furtherance of the conspiracy alleged above in Count One, USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have, through their anticompetitive actions, intentionally and wrongfully conspired to create and maintain monopoly power in the Match Market in the U.S. in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

138.    USA Cricket and the ICC's conspiracy to exclude any and all entities associated with Mr. Pandya, including American Cricket and Global, led to USA Cricket seeking a means by which to choose a commercial development partner other than an entity associated with Mr.

Pandya. USA Cricket found a willing partner in Willow, and together they conspired to create an arbitrary and illusory RFP process. In exchange for Willow funding their election campaigns, the Conflicted Board Members along with the rest of USA Cricket created a corrupt RFP process that rewarded Willow-backed ACE with an illicit monopoly in the Match Market in the United States. By conspiring to corrupt the bidding process for the creation and operation of a T20 league in the United States, USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants seek to monopolize the Match Market in the United States to the detriment of competition and consumers.

139.    As described herein, USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have repeatedly sought to harm competition by attempting to exclude from the Match Market any and all entities associated with Mr. Pandya, including American Cricket and Global, to the detriment of the sport of cricket in the United States and American cricket enthusiasts, who would have benefitted from American Cricket's more robust offerings.

140.    By agreeing with each other to impair competition and drive American Cricket out of the Match Market by, among other things, disregarding American Cricket's more financially generous RFP response, awarding Willow-backed ACE the exclusive rights to provide services in the Match Market, and excluding American Cricket from further participation in the Match Market, USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants, have conspired to monopolize the Match Market.

141.    The common purpose and impact of the conspiracy is to harm American Cricket's ability to compete and prevent fair competition in the Match Market in the U.S.

142. USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants have acted willfully, knowingly, and with specific intent in furtherance of the conspiracy by corrupting the bidding process to ensure that Willow-backed ACE was the exclusive winning Proposer, to the detriment of American cricket enthusiasts and the sport of cricket in the United States. Given USA Cricket's apparent sole award of the rights in the RFP process to Willow-backed ACE, and their ongoing negotiations to implement that award, there is a dangerous probability of Willow-backed ACE gaining monopoly power in the Match Market in the United States as a result of this conspiracy, if it has not already done so or is close to doing so already given the parties' anticompetitive and exclusionary tactics.

143. The conspiracy of USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants is a direct and proximate cause of harm to American Cricket because it has corrupted the RFP process (against the interests of American cricket enthusiasts and others involved in supporting the sport of cricket in the United States), robbing all parties of the benefits that would flow from a fair bidding process. American Cricket should have had the opportunity to compete on a legitimate playing field—one not corrupted by the conspiracy of USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants. American Cricket's injury is of the type the antitrust laws were intended to prevent and flows from that which makes unlawful the conspiracy of USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants.

144. USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants, through their anticompetitive actions described

above, have conspired to monopolize the Match Market, in violation of the Sherman Act, 15 U.S.C. § 2.

145.    Competition in the Match Market in the U.S. has been and will continue to be harmed by USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' course of conduct, and consumers in the Match Market in the United States have been and will continue to be harmed by a reduction in competition and lower quality if USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants are permitted to continue their illegal acts described herein.

146.    As a direct and proximate result of USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' conduct, competition in the relevant markets has been injured, cricket enthusiasts in the United States have been robbed of fair consideration of the most robust offering, and American Cricket has been excluded from the Match Market.  The injury American Cricket has suffered as a result of USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants' conspiracy to monopolize the Match Market constitutes antitrust injury.

## COUNT THREE

**(Section 6-4-104 of the Colorado Antitrust Act of 1992 against USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants)**

147.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

148.    Section 6-4-104 of the Colorado Antitrust Act of 1992 provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal."

149.    The actions engaged in by Defendants, as set forth in the preceding paragraphs, constitute acts in restraint of trade or commerce, in violation of the Colorado Antitrust Act of 1992.

## COUNT FOUR

**(The Cartwright Act, Cal. Bus. & Prof. Code § 16720, against USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants)**

150.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

151.    Defendants' combination, trust, or conspiracy was substantially carried out and effectuated within the State of California.

152.    The USA Cricket Board of Directors met regularly in California and conducted substantial activities in California in connection with the RFP Bid Process.  In addition, USA Cricket's Chairperson corresponded with American Cricket from California regarding the RFP Bid Process, and USA Cricket offered to meet with American Cricket in California.

153.    American Cricket's RFP Response identified California as a Target Market and included a detailed analysis of, among other things, the economics and demographics of the San Francisco-Oakland-Hayward metropolitan area.  In particular, American Cricket's RFP Response proposed building a cricket-centric, multi-purpose entertainment stadium and accompanying lifestyle center in California.  American Cricket projected that such a stadium would create approximately 17,800 new jobs and have an estimated economic impact of $100 million in that

area.  American Cricket projects that building stadiums in other cities will create roughly the same number of new jobs and economic impact.  Beginning in 2017, and continuing to present, USA Cricket, Parthen, and the ICC—and at other times Willow, Chairman Marathe, the Conflicted Board Members, and the John Doe Defendants—entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of Section 16720 of the California Business and Professions Code.

154.    These violations of Section 16720 of the California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action between Defendants, the primary goal of which is to prevent fair competition in the League Market and the Match Market in the United States.  For purposes of forming and effectuating the unlawful trust, Defendants combined and conspired to take the following acts (among others):

    a.  Exclude from the League Market and the Match Market any and all entities associated with Mr. Pandya, including American Cricket and Global.

    b.  Create a sham bidding process designed to select Willow-backed ACE (which had multiple relationships with USA Cricket board members), instead of providing fair review to American Cricket (and other Proposers).

155.    The combination and conspiracy alleged herein had the following effects:

    a.  Depriving the League Market and the Match Market—as well as American Cricket and American cricket enthusiasts—of a fair bidding process.

    b.  Depriving American Cricket (and other Proposers) of a full and fair review as part of the RFP process, thus reducing competition in the League Market and the Match Market in the United States.

156.     As a result of Defendants' conduct, American Cricket has been excluded from the League Market and the Match Market in the United States.

157.     As a direct and proximate result of Defendants' conduct, American Cricket has been injured in its business and property through its exclusion from the League Market and the Match Market in the United States.

### COUNT FIVE

**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, against USA Cricket, the ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants)**

158.     American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

159.     California's Unfair Competition Law, codified at California Business & Professions Code § 17200 *et seq.* (the "UCL"), broadly prohibits any unlawful, unfair, and fraudulent business acts or practices, and governs, among other things, anti-competitive business practices.  By committing the acts and practices alleged herein, Defendants have engaged in unlawful, unfair, and fraudulent business practices in violation of the UCL.

160.     Defendants violated the UCL's unlawful prong by, among other things, violating federal and state antitrust laws, including the federal Sherman Act (15 U.S.C. §§ 1, 2) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720).  Defendants also violated the UCL's unlawful prong by improperly interfering with American Cricket's existing and prospective business relationships, including by interfering with American Cricket's rights under the License Agreement and by excluding American Cricket from the League Market and the Match Market in the United States.

161.    Defendants violated the UCL's unfair prong by, among other things, engaging in concerted actions designed to unreasonably restrain the League Market and the Match Market, by taking actions that significantly threaten or harm competition, and by engaging in monopolistic and/or anticompetitive practices.  Defendants also violated the UCL's unfair prong by violating federal and state antitrust laws, including the federal Sherman Act (§§ 1, 2) and the California Cartwright Act (Cal. Bus. & Prof. Code § 16720), and/or the policy and spirit of such antitrust laws.

162.    Defendants violated the UCL's fraud prong by, among other things, engaging in a fraudulent scheme designed to induce American Cricket into participating in the RFP Bid Process and preparing an RFP without disclosing that Defendants did not intend to follow an objective bid process, that Defendants did not intend to abide by the specific terms and conditions set forth in the RFP, that Defendants changed the terms and conditions of such process and required consent to them and other onerous and extraordinary commitments in order to allow continued consideration in such process, and that Defendants had already selected a different Proposer.

163.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, American Cricket has suffered, and continues to suffer, damages and irreparable harm.  American Cricket is entitled to, among other things, restitution in an amount to be proven at trial and preliminary and permanent injunctive relief restraining Defendants' wrongdoing and ongoing anti-competitive behavior.

## COUNT SIX

**(Tortious Interference with Prospective Business Advantage against the ICC)**

164.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

165.    The ICC instructed USA Cricket not to select American Cricket as the winner of the RFP Bid Process, irrespective of the objective strength of American Cricket's Bid Response.

166.    The ICC knowingly and improperly interfered with the RFP Bid Process by instructing USA Cricket to select Willow-backed ACE and not any other Proposer.

167.    American Cricket has learned from members of USA Cricket's Board of Directors that certain Board members preferred American Cricket over any other Proposer and wanted USA Cricket to conduct further negotiations with American Cricket.

168.    Based on the preferences of certain Board members, the objective strength of American Cricket's RFP Response, and the experience of Mr. Pandya and the American Cricket team, among other factors, American Cricket had a reasonable likelihood that it would have entered into a contract with USA Cricket in the absence of the ICC's tortious conduct.  Indeed, USA Cricket asked only two Proposers to sign the New Terms of Engagement and advance to "Phase II":  Willow-backed ACE and American Cricket.

169.    As a result of the ICC's tortious conduct, American Cricket has suffered, and will continue to suffer, damages.

## COUNT SEVEN

### (Tortious Interference with Contract against the ICC)

170.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

171.    In 2016, Global's principal, Mr. Pandya, met with the ICC's Chairman and other ICC members who were present in London to discuss, among other things, the License Agreement.

172.    During this meeting, Mr. Pandya and the ICC's Chairman discussed the License Agreement at length.

173.    The ICC was thus aware of the existence of the License Agreement.

174.    In particular, the ICC was aware of § 11.4 of the License Agreement, which obligates USACA to "cause ICC or ICC's nominated body for the development of cricket in USA, to execute the necessary agreements which shall have the effect of providing or continuing, as the case may be, the Licensed Rights to GSV, such that GSV's rights under this Agreement are not jeopardized in the event of suspension o[r] termination of USACA's membership with ICC."

175.    Upon information and belief, the ICC refused to execute any agreements contemplated under § 11.4 of the License Agreement.

176.    Upon information and belief, the ICC prevented USA Cricket from executing any agreements contemplated under § 11.4 of the License Agreement.

177.    By refusing to execute any such agreements and preventing USA Cricket from executing any such agreements, the ICC made it impossible for USACA to perform its obligations under the License Agreement, thereby causing USACA to breach the License Agreement.

178.    By failing to perform its obligations, USACA breached the License Agreement.

179.    The ICC intended for USACA to breach the License Agreement.  For instance, the Chairman of the ICC made it clear to Mr. Pandya that the ICC had no interest in working with any entity associated with Mr. Pandya for the reasons identified above.  The ICC Chairman also pointed out to Mr. Pandya that other business people have failed to develop their cricket business if the ICC does not recognize them.

180.    The ICC acted improperly in causing USACA to breach the License Agreement.

181.    In particular, the ICC acted in its own self-interest—against the interest of its members and in violation of its Code of Ethics—in preventing American Cricket from obtaining rights to a professional T20 cricket league in the U.S.

182.    The ICC's conduct was not a remote factor in USACA's breach, but rather was a direct and proximate cause of the breach.

183.    As a result of the ICC's tortious conduct, American Cricket has suffered, and will continue to suffer, damages.

## COUNT EIGHT

**(Civil Conspiracy against USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, Parthen, and certain of the John Doe Defendants)**

184.    American Cricket incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

185.    USA Cricket, the ICC, the Conflicted Board Members, and certain of the John Doe Defendants acted together with the purpose of depriving American Cricket of its rights under the License Agreement.

186.    In particular, USA Cricket, the ICC, the Conflicted Board Members, and certain of the John Doe Defendants intentionally made it impossible for USACA to perform its obligations under § 11.4 of the License Agreement.

187.    In doing so, USA Cricket, the ICC, the Conflicted Board Members, and certain of the John Doe Defendants caused USACA to breach the License Agreement.

188.    As a proximate result of those Defendants' illegal actions, American Cricket has suffered, and will continue to suffer, damages.

## RELIEF REQUESTED

WHEREFORE, American Cricket respectfully requests that this Court:

A.      Enter judgment in favor of American Cricket and against Defendants USA Cricket, ICC, Willow, Chairman Marathe, the Conflicted Board Members, Parthen, and John Does 1-10.

B.      Award American Cricket its actual damages, together with prejudgment interest and costs, as a result of Defendants' unlawful actions in an amount to be determined at trial.

C.      Preliminarily and permanently enjoin USA Cricket, the ICC, Chairman Marathe, the Conflicted Board Members, and Parthen from (i) taking any further action to support or implement their selection of a winner in connection with the corrupted RFP Bid Process described herein; (ii) excluding American Cricket from, or failing to give objective and unbiased consideration to American Cricket in, any current or future selection process in connection with a professional T20 cricket league in the U.S.; and (iii) using unfair practices in any selection process or implementation of their programs in connection with a professional T20 cricket league in the U.S.

D. Award treble damages, interest, and attorneys' fees to American Cricket pursuant to the Sherman Antitrust Act, 15 U.S.C. §§ 1-2; the Clayton Act, 15 U.S.C. § 15; § 6-4-114 of the Colorado Antitrust Act; and § 16750(a) of the Cartwright Act.

E. Award American Cricket damages and injunctive relief under Cal. Bus. & Prof. Code § 17200 *et seq.*

F. Award American Cricket such other relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), American Cricket hereby demands a trial by jury on all issues triable of right by a jury.

DATED: May 28, 2019

*s/James Hartley*
James Hartley
Adam A. Hubbard
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, Colorado 80302
Phone:  (303) 473-2700
jhartley@hollandhart.com
aahubbard@hollandhart.com

Karl Geercken
Christopher J. Borchert
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 210-9400
Karl.Geercken@alston.com
Christopher.Borchert@alston.com

Adam J. Biegel
Austin A.B. Ownbey
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004

Phone: (202) 239-3300
Adam.Biegel@alston.com
Austin.Ownbey@alston.com

*Attorneys for Plaintiff American*
*Cricket Premier League, LLC*