# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:19-cv-01521

AMERICAN CRICKET PREMIER
LEAGUE, LLC,

        Plaintiff,

v.

USA CRICKET, a Colorado Non-Profit
Corporation, INTERNATIONAL CRICKET COUNCIL,
WILLOW TV, INC., PARAAG MARATHE,
AVINASH GAJE, VENU PISIKE, ATUL RAI,
NADIA GRUNY, ERIC PARTHEN, and JOHN DOES 1-10,

        Defendants.

---

## DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT [DKT. NO. 39-1] PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

---

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF CONFERRAL ...................................................................... 1

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 3

    A.   The Parties ......................................................................................... 3

    B.   The RFP Process ................................................................................ 4

    C.   ACPL's Lawsuit ................................................................................. 7

III.  LEGAL STANDARD .................................................................................. 9

IV.   ARGUMENT ............................................................................................. 10

    A.   ACPL Lacks Article III Standing Because It Has Not Alleged A Concrete Injury That Would Be Redressable By A Favorable Decision ............................ 10

    B.   ACPL Fails To State An Antitrust Claim ........................................... 12

        1.   ACPL's Antitrust Claims Must Be Dismissed Because ACPL Fails To Allege An Antitrust Injury .................................... 12

        2.   ACPL's Section 1 Claim Is Fatally Defective ......................... 15

            a.   Awarding ACE exclusive rights is "presumptively legal" .......... 16

            b.   ACPL's Section 1 claim fails because there are insufficient allegations of concerted action .................................... 18

        3.   ACPL's Conspiracy To Monopolize Claim Fails As A Matter of Law ................................................................. 21

        4.   ACPL's State Law Claims Fail For The Same Reasons Its Federal Antitrust Claims Fail ........................................ 23

    C.   ACPL Fails To State A UCL Claim .................................................... 24

    D.   ACPL Fails To State A Claim For Tortious Interference With Prospective Business Advantage ......................................................... 26

    E.   ACPL Fails To State A Claim for Tortious Interference With Contract ............ 30

    F.   ACPL Fails To State A Claim For Civil Conspiracy ........................... 35

V.    CONCLUSION ........................................................................................... 35

MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
  121 F. Supp. 3d 950 (C.D. Cal. 2015) ....................................................................31

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)........................................................................................18, 19, 20

*Ambase Corp. v. City Inv'g Co. Liquidating Tr.*,
  No. 01 CIV. 10761 (RJW), 2002 WL 1482619 (S.D.N.Y. July 9, 2002)................33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................10, 29, 34

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990).....................................................................................13

*Augustine v. Trucco*,
  124 Cal. App. 2d 229 (1954) ...........................................................................31

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
  843 F.3d 1225 (10th Cir. 2016) ........................................................................22

*Basso v. Utah Power & Light Co.*,
  495 F.2d 906 (10th Cir. 1974) .........................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................9, 10, 29, 34

*Bell v. Fur Breeders Agric. Co-op.*,
  348 F.3d 1224 (10th Cir. 2003) .......................................................................19

*Beyer Laser Ctr., LLC v. Polomsky*,
  No. 16-cv-03099-MEH, 2017 WL 818659 (D. Colo. Mar. 2, 2017).....................10

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).......................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)........................................................................................13

*Bryson v. Gonzales*,
  534 F.3d 1282 (10th Cir. 2008) ........................................................................9

MOTION TO DISMISS

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Bushie v. Stenocord Corp.*,
460 F.2d 116 (9th Cir. 1972) ...............................................................................18

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...................................................................................24, 25

*Champagne Metals v. Ken–Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ............................................................................18

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ..............................................................................25

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
No. 09-cv-01241-JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ......................17

*Condo v. Conners*,
266 P.3d 1110 (Colo. 2011) (en banc) ..................................................................31

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) .................................................................................18, 19, 20

*Dreiling v. Peugeot Motors of Am., Inc.*,
850 F.2d 1373 (10th Cir. 1988) ............................................................................18

*Dryden v. Tri-Valley Growers*,
65 Cal. App. 3d 990 (Cal. App. 1977) ..............................................................32, 34

*Drywave Techs. USA, Inc. v. Massage Int'l, Ltd.*,
No. 16-cv-01775-MSK-NYW, 2017 WL 3086623 (D. Colo. Mar. 27, 2017) ........27

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997) .................................................................................17

*Genetic Sys. Corp. v. Abbott Labs.*,
691 F. Supp. 407 (D.D.C. 1998) ...........................................................................17

*Golden v. Sound Inpatient Physicians Med. Grp., Inc.*,
93 F. Supp. 3d 1171 (E.D. Cal. 2015) ...................................................................24

*Goldenberg v. Bartell Broad. Corp.*,
47 Misc. 2d 105 (N.Y. Sup. 1965) ........................................................................33

*Gregory v. Fort Bridger Rendezvous Ass'n*,
448 F.3d 1195 (10th Cir. 2006) ............................................................................19

iii

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*Hertz v. Luzenac Grp.*,
 576 F.3d 1103 (10th Cir. 2009) ........................................................27

*Holter v. Moore & Co.*,
 702 F.2d 854 (10th Cir. 1983) ........................................................19

*In re NFL Sunday Ticket Antitrust Litig.*,
 No. 15-02668-BRO, 2017 WL 3084276 (C.D. Cal. June 30, 2017) ......................................23

*J.J. Indus., LLC v. Bennett*,
 71 P.3d 1264 (Nev. 2003) (per curiam) ..............................................31

*Jensen v. Am.'s Wholesale Lender*, 425 F. App'x 761 (10th Cir. 2011) ................................10, 26

*JetAway Aviation LLC v. Bd. of Cty. Comm'rs of Montrose*,
 No. 07-cv-02563-RPM, 2012 WL 1044304 (D. Colo. 2012), *aff'd* 754 F.3d
 824 (*per curium*) ........................................................13, 14, 17

*JPMorgan Chase Bank, N.A. v. KB Home*,
 740 F. Supp. 2d 1192 (D. Nev. 2010) ......................................32

*Kearns v. Ford Motor Co.*,
 567 F.3d 1120 (9th Cir. 2009) ........................................................25

*Key Fin. Planning Corp. v. ITT Life Ins. Corp.*,
 828 F.2d 635 (10th Cir. 1987) ........................................................17

*Klein v. Grynberg*,
 44 F.3d 1497 (10th Cir. 1995) ........................................................27

*Koch v. Koch Indus., Inc.*,
 203 F.3d 1202 (10th Cir. 2000) ........................................................10

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134 (2003) ........................................................26

*Krantz v. BT Visual Images, L.L.C.*,
 89 Cal. App. 4th 164 (2001) ........................................................24

*Krystkowiak v. W.O. Brisben Cos.*,
 90 P.3d 859 (Colo. 2004) (en banc) ........................................................31

*Lantec, Inc. v. Novell, Inc.*,
 306 F.3d 1003 (10th Cir. 2002) ........................................................22

iv

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nev.*,
    792 P.2d 386 (Nev. 1990) (*per curiam*)...................................................................30

*Lazar v. Superior Court*,
    12 Cal. 4th 631 (1996) ...............................................................................................25

*Levi Case Co. v. ATS Prods., Inc.*,
    788 F. Supp. 428 (N.D. Cal. 1992) ...........................................................................21

*Lorenzo v. Qualcomm Inc.*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009)......................................................................23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).........................................................................................10, 11, 12

*Madrid v. Perot Sys. Corp.*,
    130 Cal. App. 4th 440 (2005) ....................................................................................26

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
    271 F.3d 825 (9th Cir. 2001) .....................................................................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................................16

*MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*,
    165 P.3d 882 (Colo. App. 2007) ...............................................................................28

*Moss v. Infinity Ins. Co.*,
    197 F. Supp. 3d 1191 (N.D. Cal. 2016) ....................................................................25

*Mount Evans Co. v. Madigan*,
    14 F.3d 1444 (10th Cir. 1994) ..................................................................................12

*New York Tel. Co. v. Teichner*,
    329 N.Y.S.2d 689 (Dist. Ct. 1972) ...........................................................................34

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ..................................................................................24

*Paul Steelman Ltd. v. HKS, Inc.*,
    No. 2:05-cv-01330-BES-RJJ, 2007 WL 295610 (D. Nev. Jan. 26, 2007)...............31

*Peterson v. Miranda*,
    57 F. Supp. 3d 1271 (D. Nev. 2014)..........................................................................35

v

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Plaza Esteban v. La Casa Nino, Inc.*,
    738 P.2d 410 (Colo. App. 1987), *rev'd on other grounds*, 762 P.2d 669 (Colo.
    1988) (en banc) ...................................................................................................................28

*Pueblo of Jemez v. United States*,
    790 F.3d 1143 (10th Cir. 2015) ...........................................................................................9

*R-G Denver, Ltd. v. First City Hldgs. of Colo., Inc.*,
    789 F.2d 1469 (10th Cir. 1986) .........................................................................................32

*Radil v. Sanborn W. Camps, Inc.*,
    384 F.3d 1220 (10th Cir. 2004) ...........................................................................................9

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
    2 Cal. 5th 505 (2017) ..........................................................................................................27

*Rubio v. Capital One Bank*,
    613 F. 3d 1195 (9th Cir. 2010) .......................................................................................6, 25

*Rusheen v. Cohen*,
    37 Cal. 4th 1048 (2006) ......................................................................................................35

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) .............................................................................................18

*Safe Streets Alliance v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) .............................................................................................9

*Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*,
    861 F. Supp. 2d 1256 (D. Colo. 2012).......................................................................2, 27, 31

*Sheet Metal Duct, Inc. v. Lindab, Inc.*,
    No. 99-6299, 2000 WL 987865 (E.D. Pa. July 18, 2000) ..................................................23

*Shell v. Am. Family Rights Ass'n*,
    899 F. Supp. 2d 1035 (D. Colo. 2012)................................................................................35

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
    No. CV-10-1077, 2011 WL 2174499 (D. Del. May 26, 2011)...........................................21

*Simon v. E. Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976)...............................................................................................................12

*Smalley & Co. v. Emerson & Cuming, Inc.*,
    808 F. Supp. 1503 (D. Colo. 1992), *aff'd*, 13 F.3d 366 (10th Cir. 1993) ......................16, 24

vi

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Smith v. United States*,
    561 F.3d 1090 (10th Cir. 2009) ............................................................5

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..............................................................10, 11

*Tarmann v. State Farm Mutual Auto. Ins. Co.*,
    2 Cal. App. 4th 153 (1991) ......................................................26

*TDN Money Sys., Inc. v. Global Cash Access, Inc.*,
    No. 2:15-CV-2197, 2016 WL 4157308 (D. Nev. Aug. 3, 2016) ...........................27

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) .................................................16

*United States v. Mobile Materials, Inc.*,
    881 F.2d 866 (10th Cir. 1989) ..................................................17

*Verlo v. City & Cnty. of Denver*,
    177 F. Supp. 3d 1305 (D. Colo. 2016).........................................9

*Warne v. Hall*,
    373 P.3d 588 (Colo. 2016)......................................................30

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
    796 F.2d 1216 (10th Cir. 1986) ...............................................18

*Winther v. DEC Intern., Inc.*,
    625 F.Supp. 100 (D. Colo. 1985)..............................................23

*Wyoming Sawmills Inc. v. U.S. Forest Serv.*,
    383 F.3d 1241 (10th Cir. 2004) ...............................................12

*Zhang v. Superior Court*,
    57 Cal. 4th 364 (2013) ..........................................................24

**STATUTES**

California Unfair Competition Law
    Cal. Bus. & Prof. Code § 17200 .........................................24, 25, 26

Cartwright Act
    Cal. Bus. & Prof. Code § 16700 ............................................23, 24

MOTION TO DISMISS

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Colorado Antitrust Act of 1992
    Section 6-4-104 ..............................................................................................................23, 24

Sherman Act
    15 U.S.C §§ 1, 2 .................................................................................................. *passim*

## RULES

Fed. R. Civ. P.
    9(b) ..............................................................................................................................10, 26
    12(b)(1) .............................................................................................................................9
    12(b)(6) .............................................................................................................................9
    16 .......................................................................................................................................1

## OTHER AUTHORITIES

Herbert Hovenkamp, *Federal Antitrust Policy* (5th ed. 2016) ......................................................13

10 N.Y. JUR. CONTRACTS
    § 231 ................................................................................................................................34

## CERTIFICATE OF CONFERRAL

The undersigned certify that they discussed this Motion in detail with opposing counsel during the parties' Rule 16 conference. Plaintiff's counsel took Defendants' position under advisement, and subsequently communicated ACPL's opposition to the Motion. Based on Plaintiff's position, Defendants do not believe further amendment of the complaint will cure its deficiencies.

## I.   INTRODUCTION

Plaintiff American Cricket Premier League, LLC ("ACPL") is a disgruntled losing bidder that sought to be Defendant USA Cricket's partner in creating, *inter alia*, a sanctioned, professional T20 cricket league in the United States (the "League"). Rather than accept defeat—or even the possibility that its bid was inferior to that of the winning bidder unanimously chosen by USA Cricket's board, American Cricket Enterprises, Inc. ("ACE")—ACPL's Complaint spins a fanciful tale claiming that USA Cricket's RFP process for choosing a partner was a "sham" and that ACPL was the victim of a conspiracy designed to exclude it from an opportunity to create a league with USA Cricket. The theory is implausible. USA Cricket was under no obligation either to issue an RFP or to even consider ACPL's bid. It could have chosen a partner without considering any bids at all. Yet it invited proposals for the League, evaluated ACPL's bid, and even invited ACPL to discuss, in person, its proposal in more detail and asked for further information. Under ACPL's telling, USA Cricket engaged in this time-consuming process *for no reason* because ACE was, allegedly, the predetermined winner. Given the implausibility of ACPL's story, it should be no surprise that Defendants vigorously dispute ACPL's allegations of a "sham," "bias," or other conflicted motives and are prepared to prove these allegations of impropriety are false. But there is no need because, accepting ACPL's allegations as true, this case fails at the pleading stage for numerous reasons.

1

*First*, the Court lacks subject matter jurisdiction because ACPL has not sufficiently alleged Article III standing. ACPL claims it was deprived of an objective evaluation of its bid. But it does not—and cannot—allege that USA Cricket was required to choose ACPL as a business partner, notably conceding that ACPL was never "guaranteed" to win the contract. Thus, ACPL has not suffered a concrete or redressable injury.

*Second*, all of ACPL's antitrust claims fail at the outset because ACPL cannot allege antitrust injury. At most, ACPL asserts that *it*, not ACE, should have been granted the exclusive rights to create the League. But the victory of one alleged "monopolist" over another does not *reduce* competition as a matter of law. Because there has been no harm to competition, ACPL has not suffered an antitrust injury and, accordingly, cannot state an antitrust claim.

*Third*, ACPL's antitrust claims fail for other reasons. USA Cricket is free to choose its business partners, and its decision to award a contract to ACE is "presumptively legal." ACPL also fails to allege sufficient facts to establish concerted action to support a Section 1 claim or acts in furtherance of a conspiracy to monopolize to support a Section 2 claim. ACPL's derivative state law antitrust and unfair competition claims similarly fail.

*Fourth*, ACPL's tortious interference and civil conspiracy claims are critically deficient. ACPL's tortious interference with prospective business relationship claim fails because it does not sufficiently allege (1) a prospective business relationship with USA Cricket, (2) interference, or (3) that Defendant International Cricket Council ("ICC") acted improperly or intended to cause ACPL harm. ACPL's tortious interference with contract claim fails because (1) ACPL lacks standing as it was not a party to the contract in question and was not assigned the right to enforce it; (2) ACPL cannot allege that the contract was breached (because the conditions precedent to the obligations that were purportedly breached are not and could not be alleged to

2

have occurred); (3) ACPL cannot allege that the ICC interfered (much less improperly interfered) with an obligation to procure licensing rights from the ICC or USA Cricket that they had no obligation to issue; and (4) ACPL fails to otherwise sufficiently plead facts that would support a claim for interference. ACPL's derivative civil conspiracy claim, based on the same conduct as its tortious interference with contract, fails for the same reasons.

ACPL's fatally flawed Complaint turns a simple rejection into an implausible conspiracy. But there is a much simpler explanation. ACPL made a proposal, and lost. The game is over. The Court should not countenance ACPL's baseless request for a court-ordered do-over and should dismiss the Complaint in its entirety.

## II.   **FACTUAL BACKGROUND**[1]

### A.   **The Parties**

Defendant ICC is the global governing body for cricket, and has over 100 national governing bodies as members, each of which oversees development of the sport of cricket in its country and has exclusive rights to promote events that may be sanctioned by the ICC in that country. *See* Compl. ¶¶ 2, 35. Defendant USA Cricket is the national governing body for cricket in the United States and is a member of the ICC. *Id*. ¶ 2. USA Cricket was established in late-2017 after the previous national governing body for cricket in the United States, the United States of America Cricket Association ("USACA"), was expelled from the ICC. *Id*. ¶¶ 36, 57-58. The ICC assisted in establishing USA Cricket. *Id*. ¶¶ 55, 59. ICC allegedly continues to provide "funding" and "logistical and administrative support" to USA Cricket. *Id*. ¶ 61-62. Defendant

---

[1] The facts are based on ACPL's amended complaint (Dkt. No. 39-1). Unless otherwise stated, they are assumed to be correct solely for purposes of this motion. On July 24, 2019, ACPL filed a Motion to Substitute Name of Defendant Willow TV, Inc. and to Designate Names of John Doe 1 and John Doe 2 ("Motion to Substitute"). *See* Dkt. No. 39. ACPL's motion attached an amended complaint (Dkt No. 39-1), which refers to—but does not re-attach—exhibits to the original complaint (Dkt. No. 1). As such, the "Compl." cites are to Dkt. No. 39-1, but cites to complaint exhibits—which are still referenced in Dkt. No. 39-1—are to those attached to the original complaint.

MOTION TO DISMISS

Paraag Marathe is the Chairman of the USA Cricket Board of Directors, and Defendants Avinash Gaje, Venu Pisike, Atul Rai, and Nadia Gruny are USA Cricket board members. *Id*. ¶ 15-19. Defendant Eric Parthen is currently an employee of USA Cricket.[2]

Defendant ACE and Plaintiff ACPL are two of a number of bidders that submitted proposals to create a sanctioned, professional T20 league in the United States (the "League"). *Id*. ¶¶ 5, 81. ACPL contends that ACE is affiliated with the Times Group of India, which owns Defendant Cricket Acquisition Corp. ("CAC") and Defendant Willow TV International. *Id*. ¶¶ 4, 12, 14.[3] The principals of ACPL are Jay Pandya and Steve Maksin. *Id*. ¶ 9. Mr. Pandya was previously chairman of Global Sports Ventures ("GSV"). While USACA was suspended, but prior to its expulsion, USACA and GSV entered into an agreement ("License Agreement") that purported to grant exclusive rights to GSV (the "Licensed Rights") to create the League. *Id*. ¶¶ 38-41, Ex. C (Dkt. No. 1-3). The grant of Licensed Rights was necessarily contingent on USACA getting its suspension lifted, which never happened, thus "prevent[ing]" GSV from "obtaining the Licensed Rights." *Id*. ¶¶ 42, 52-53.

### B. The RFP Process

In November 2018, USA Cricket issued a Request for Proposal ("RFP") soliciting bids for a commercial partner to create the League. *Id*. ¶ 71. The RFP set forth fifteen topics bidders needed to address, and stated that USA Cricket would consider a number of factors, including but not limited to the "quality and scope" of the bid, the bidder's "financial condition, ownership

---

[2] Mr. Parthen has been a USA Cricket employee since January 1, 2019. Prior to that date, he was an employee of ICC Americas and Project Manager for USA Cricket. The Complaint incorrectly alleges that he is an ICC employee. Compl. ¶ 20.

[3] On July 24, 2019, ACPL filed a motion to substitute Willow TV International for Willow TV, Inc., and to designate ACE for John Doe 1, and CAC for John Doe 2. *See* Dkt. No. 39. Therefore, proposed Defendants Willow TV International, ACE, and CAC therefore join this motion with the assumption that the Court will allow the substitution.

MOTION TO DISMISS

structure and ability to credibly secure and underwrite the costs of the proposal," and the bidder's "ability to execute a long term vision and plan." *Id.* ¶¶ 74-75. Critically, the RFP noted that "USA Cricket reserves the right to select proposals for further consideration or reject any and all proposals for any reason whatsoever." *Id.*, Ex. D (Dkt. No. 1-4) at § 6.[4] Thus, ACPL was "not guaranteed to be selected as a commercial business partner of USA Cricket and the ICC." *Id.* ¶ 7. Indeed, ACPL does not allege that USA Cricket was even obligated to issue an RFP soliciting bids for the League, much less required to consider a proposal by ACPL. The RFP also explained that the ICC had "committed to provide financial and human resources, knowledge, expertise, and guidance to USA Cricket" in the "development of this professional T20 league. As such, this RFP process is fully supported by the ICC." *Id.* ¶ 73.

ACPL and ACE (as well as others) submitted bids. ACPL was among the finalists invited to present its bid to members of the USA Cricket Board and allegedly offered more in financial compensation to USA Cricket than the winning bidder, ACE. *Id.* ¶¶ 82, 87. On March 18, 2019, USA Cricket informed ACPL that its bid had been rejected because USA Cricket was "seeking a long-term partner who can strike the *optimal balance of being bullish yet practical in their plans*" and "*did not feel [ACPL's] proposal aligned with this.*" *Id.*, Ex. F (Dkt. No. 1-6) at 1 (emphasis added). Rather, USA Cricket believed ACE "has the best chance for success in the U.S. and can provide unparalleled benefits to USA Cricket, in both the short and long term." *Id.* In other words, despite ACPL claiming to offer the most money to USA Cricket, financial remuneration was only one consideration and even then, USA Cricket did not find ACPL's proposal to be realistic. After ACPL asked for more information as to why its bid was rejected,

---

[4] Exhibits to the Complaint are incorporated by reference therein and can be considered on a motion to dismiss. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

MOTION TO DISMISS

Mr. Marathe responded on March 20, 2019, making clear that "[f]inding the right partner … is extremely important and involves many layers and levers of comfort – financial resources *is only one piece of the puzzle*" and that USA Cricket's board's "responsibility isn't just to look at the size of the numbers, but to also evaluate the veracity of the source of those funds and how much we believe they can come to fruition." *Id.* ¶¶ 92-93 and Affidavit of Rishi Satia in Support of Defendants' Motion to Dismiss ("Satia Aff."), Ex. 1 (Marathe 3/20 email) (emphasis added).[5]

ACPL responded by indicating it was willing to "secure the payments to be made to USA Cricket … by way of a bank guarantee," which USA Cricket believed was new information. *Id.* ¶ 96. ACPL alleges "USA Cricket … did not fully understand" ACPL's bid because its RFP response indicated that "its financial commitments were guaranteed." *Id.* ¶¶ 95, 97. But ACPL does not—and cannot—allege that its RFP response explained its financial commitments came with a *bank* guarantee. On April 2, Mr. Parthen emailed ACPL explaining that "all decisions" in the RFP process had been "supported unanimously by the USA Cricket Board" and that "USA Cricket is entitled to prefer any tenderer it likes and to follow any process that it likes to enter into a private contractual arrangement of its choosing." *Id.* ¶¶ 96, 99 and Satia Aff., Ex. 2 (Parthen 4/2 email). Nevertheless, because ACPL offered new information about a *bank* guarantee, Mr. Parthen offered ACPL the "opportunity to re-present to the RFP committee in more detail the financial projections and proposed funding mechanisms - particularly the bank guarantee arrangements." *Id.* For this next stage, USA Cricket asked ACPL and ACE to sign "Terms of Engagement" if it wished to engage in "further discussions and/or negotiations." *Id.*

---

[5] Mr. Marathe's March 20 email and Mr. Parthen's April 2 email (also discussed herein) are not attached to ACPL's Complaint but are referenced in paragraphs 93 and 96, 99, respectively. Also, Exhibit H to the Complaint (Dkt. No. 1-8) is the attachment to Mr. Parthen's April 2 email. Therefore, the Court may consider them without converting Defendants' motion to dismiss into a motion for summary judgment. *See Burnett v. Mortgage Elec. Registration Sys.*, 706 F.3d 1231, 1234 n.1 (10th Cir. 2013).

MOTION TO DISMISS

¶¶ 102-108. ACE signed the terms and conditions; ACPL refused. *Id.* ¶¶ 107, 108.

Mr. Parthen's email offering ACPL the opportunity to further discuss its proposal with USA Cricket was just one instance, among many, where USA Cricket left the door open to working further with ACPL or its principals, Mr. Pandya and Mr. Maksin. On March 18, Mr. Parthen wrote that despite rejecting ACPL's bid, USA Cricket "look[s] forward to exploring potential collaboration opportunities with you." *Id.*, Ex. F (Dkt. No. 1-6). On March 20, Mr. Marathe wrote "[t]here may be an opportunity to work together in the future in a partnership capacity … and we can continue to explore those conversations." Satia Aff., Ex. 1 (3/20 Marathe email). On April 15, Mr. Parthen wrote that if ACPL did not wish to re-present its bid to the RFP committee, there may be a "potential for you to join [ACE's] effort in some capacity" and that USA Cricket could "facilitat[e] the conversation," even though the "agreement would not involve" USA Cricket. Compl., Ex. I (Dkt. No. 1-9). ACPL rejected these offers and filed this Complaint instead.

### C.   **ACPL's Lawsuit**

The basic thrust of ACPL's Complaint is that Defendants engaged in a "sham" RFP process because they were intent on excluding Mr. Pandya and ACPL professional T20 cricket in the United States. *See, e.g.*, *id.* ¶¶ 4-5. ACPL makes various allegations claiming certain USA Cricket board members received free advertising from Willow TV (affiliated with ACE according to the Complaint) and/or were beholden to the ICC, which was allegedly biased against Mr. Pandya.  *Id.* at ¶¶ 46-47, 81. Defendants vigorously dispute these allegations—they are false—but for purposes of this motion, where they must be accepted as true, these allegations fail to state the basis for any claims against any defendant.

ACPL claims USA Cricket, the ICC, the individual defendants, and ACE violated Section 1 of the Sherman Act (Count 1) by choosing ACE to establish the League and thus

purportedly excluded ACPL from the alleged League Market, defined as "the market for the provision of services related to the creation and operation of an internationally recognized professional T20 cricket league sanctioned, governed, and regulated by the ICC." *Id.* ¶¶ 115, 128. Notably, however, ACPL is not challenging USA Cricket's decision to sanction only one League (*i.e.*, to sanction a single league, as occurs in many sports, rather than sanction multiple leagues to compete against each other); rather it believes that Defendants' allegedly "sham bidding process" prevented the best bidder (purported to be ACPL) from being "awarded the coveted partnership." *Id.* ¶ 122. ACPL also alleges that Defendants violated Section 2 of the Sherman Act (Count 2) by conspiring to monopolize the alleged "Match Market," defined as "the market for the provision of services related to organizing, promoting, administering, and hosting professional T20 cricket matches." *Id.* ¶ 117. ACPL claims Defendants "conspired" when USA Cricket chose ACE as the winner of the RFP process thus, allegedly, "awarding Willow-backed ACE the exclusive rights to provide services in the Match Market." *Id.* ¶ 142. ACPL also brings derivative state law antitrust (Counts 3, 4) and state statutory unfair competition (Count 5) claims based on the same conduct. *See, e.g.*, *id* ¶¶ 151, 156, 162-164.

Additionally, ACPL brings tortious interference claims against ICC. First, it claims the ICC interfered with ACPL's prospective business advantage (Count 6) by purportedly instructing USA Cricket to choose ACE instead of ACPL as the winner of the RFP. *Id.* ¶ 167. Second, it claims the ICC tortiously interfered with an agreement (the "License Agreement") entered into by non-parties USACA and GSV (Count 7) by preventing USACA from complying with its obligations under §11.4 of the License Agreement. *Id.* ¶ 178. Under certain circumstances, which ACPL does not and cannot allege ever occurred, that provision requires USACA to "cause" the ICC or its nominated body for the development of cricket in the USA (USA Cricket is now the

MOTION TO DISMISS

national governing body)—non-parties to the contract—to provide certain "Licensed Rights" to GSV. *See id.* ¶ 176. Finally, ACPL also asserts a civil conspiracy claim (Count 8) against Defendants based on the same allegations made in Count 7. *Id.* ¶ 188.

## III.   <u>LEGAL STANDARD</u>

Federal courts have "limited subject matter jurisdiction and may only hear cases when empowered to do so by the Constitution and by act of Congress." *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) (citation and internal quotation marks omitted). ACPL, as the party asserting federal jurisdiction, bears the burden of demonstrating the grounds under which the Court may accept subject matter jurisdiction over the action. *See Verlo v. City & Cnty. Of Denver*, 177 F. Supp. 3d 1305, 1306 (D. Colo. 2016) (citing *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974)). Under Rule 12(b)(1), if the allegations fail to establish subject matter jurisdiction, the court must dismiss the complaint: "'A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking.'" *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 877 (10th Cir. 2017) (citing *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must "contain direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). Although the court must take all well-pled allegations of material fact as true, "labels and conclusions, and a formulaic recitation of the elements of a cause of action" are not sufficient; courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

MOTION TO DISMISS

A court must disregard unreasonable inferences or legal characterizations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The court also need not credit allegations that are internally contradictory. *See Beyer Laser Ctr., LLC v. Polomsky*, No. 16-cv-03099-MEH, 2017 WL 818659, at *7 (D. Colo. Mar. 2, 2017). If a complaint fails to properly state any claim for relief, it must be dismissed in order to "avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" *Twombly*, 550 U.S. at 560-61.

Where a plaintiff attempts to allege fraud, as ACPL does here in Count Five, the supporting allegations must meet the heightened pleading standard of Rule 9(b). *Jensen v. Am.'s Wholesale Lender*, 425 F. App'x 761, 763 (10th Cir. 2011). Failure to plead fraud with particularity as required by Rule 9(b) mandates dismissal. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236-37 (10th Cir. 2000).

## IV.   ARGUMENT

### A.   ACPL Lacks Article III Standing Because It Has Not Alleged A Concrete Injury That Would Be Redressable By A Favorable Decision

ACPL's complaint fails to allege Article III standing and must be dismissed for lack of subject matter jurisdiction. To satisfy the "constitutional minimum" of Article III standing, ACPL must allege facts clearly demonstrating: (1) that it has suffered an "injury-in-fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged conduct of the defendant"; and (3) that the injury will likely "be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). ACPL has not, and cannot, allege these required elements.

First, ACPL fails to allege a "concrete and particularized" injury.  An injury must not

MOTION TO DISMISS

only be "particularized"—i.e., affecting "the plaintiff in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1—it must also be "concrete," which means it "must actually exist … and not [be] 'abstract.'" *Spokeo*, 136 S. Ct. at 1548. A plaintiff cannot simply "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id*. at 1549. But that is precisely what ACPL has done here, claiming only that Defendants "robbed [it] of an opportunity to compete fairly" and that it was "entitled to a fair bidding process." Compl. ¶¶ 6-7; *see also id.* at pp. 47-48 (Relief Requested, ¶ C) (requesting injunction requiring Defendants to give ACPL "objective and unbiased consideration" in "any current or future selection process" for a professional T20 cricket league).[6] This type of intangible harm— the inability to compete fairly—is insufficiently concrete to establish Article III standing. Although ACPL feints that it could have won a bidding contest untainted by Defendants' alleged misconduct, *see, e.g.*, *id*. ¶ 134 (alleging ACPL would have "competed fairly for and secured" the bid), it fatally, and necessarily, concedes that "it was not guaranteed to be selected as a commercial business partner of USA Cricket and the ICC." *Id*. ¶ 7. That concession is consistent with USA Cricket's RFP, which clearly states that USA Cricket "reserves the right to select proposals for further consideration or ***reject any and all proposals for any reason whatsoever***." Compl., Ex. D (Dkt. No. 1-4) at § 6 (emphasis added). Indeed, ACPL does not—and cannot— allege that USA Cricket was *required* to have an RFP process or consider any bids at all, much less ACPL's bid. It certainly cannot allege that USA Cricket was obligated to award ACPL the bid under any circumstances. Thus, any injury or damages premised on the claim that ACPL would win an allegedly "fair" bidding process is necessarily pure conjecture.

---

[6] ACPL also claims, in conclusory fashion, that it suffered damages as a result of Defendants' conduct but fails to explain how merely being a denied "an opportunity to compete fairly" translates into damages. *See* Compl. ¶ 1, 6; *id.* at pp. 47-48 (Relief Requested, ¶¶ B & D).

MOTION TO DISMISS

Second, even if ACPL had alleged a concrete and particularized—and traceable—injury, it still lacks Article III standing because any such injury is not redressable. An injury is redressable when it is "likely,' as opposed to merely 'speculative,' that [it] will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561(quoting *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). A plaintiff has not suffered a redressable injury where there is "no guarantee" it will ultimately be awarded a contract. *See, e.g., Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994) (holding plaintiff lacked Article III standing to compel Forest Service to rebuild a facility, which would allow plaintiff to compete for concessions contract, because there was "no guarantee" the plaintiff "would be awarded the … contract"); *Wyoming Sawmills Inc. v. U.S. Forest Serv.*, 383 F.3d 1241, 1248-49 (10th Cir. 2004) (holding a loss of opportunity to bid on logging projects was not a redressable injury sufficient to confer standing). As noted above, ACPL itself alleges that it was not "guaranteed" to win the bid. Compl. ¶ 7. Although ACPL requests a "do-over" for the bidding process, the RFP made clear that USA Cricket could reject the bid "for any reason whatsoever." ACPL does not request—nor does it have any basis to request—that the Court award the bid to ACPL or force USA Cricket and ACPL to be business partners. As a result, any claimed damages for not being awarded the bid are speculative. ACPL fatally, and incurably, lacks Article III standing. The complaint should be dismissed with prejudice.

### B.    ACPL Fails To State An Antitrust Claim

#### 1.    ACPL's Antitrust Claims Must Be Dismissed Because ACPL Fails To Allege An Antitrust Injury

As a threshold matter, ACPL's antitrust claims must be dismissed because ACPL cannot allege antitrust injury. It is axiomatic that the antitrust laws protect "competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Therefore, to state an

12

antitrust claim, ACPL must plead *antitrust injury*, which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (antitrust injury requirement ensures "that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior").

The gravamen of ACPL's complaint is that ACE, not ACPL, was awarded the exclusive rights to create the League. Compl. ¶¶ 85, 142. ACPL's complaint, therefore, is not that there has been a *reduction* in competition, but that it was not chosen as the alleged monopolist. That is not an antitrust injury as a matter of law. The "antitrust law does not criminalize the protection of one monopolist from the aggressive efforts of another seeking to replace it." *JetAway Aviation LLC v. Bd. of Cty. Comm'rs of Montrose*, No. 07-cv-02563-RPM, 2012 WL 1044304, *4 (D. Colo. 2012), *aff'd* 754 F.3d 824 (*per curium*). Rather, "it is clear that a defeated monopolist cannot establish an antitrust injury simply by pointing to the victory of the 'substitute monopolist.'" *JetAway*, 754 F.3d at 840 (Holmes, J., concurring); *see also id.* at 859 (Tymkovich, J., concurring) ("a corrupt bid process" does not "reduce[] competition when the parties are bidding for an exclusive concession" and thus plaintiff "cannot state a harm to competition with regard to the bid process … even if it was corrupt"); Herbert Hovenkamp, *Federal Antitrust Policy* at 817-18 (5th ed. 2016) ("[I]f the plaintiff's only claim is of the nature 'I, rather than the defendant, was entitled to be the monopolist,' then the plaintiff is not a victim of antitrust injury.").

ACPL's conclusory allegations regarding harm to competition and use of antitrust "buzzwords" cannot avoid or surmount its inability to allege antitrust injury. Although ACPL

13

alleges, in conclusory fashion and without supporting facts, that Defendants' alleged "sham bidding process" will lead to lower quality, lower output, and higher prices (Compl. ¶¶ 122-25), what it is actually alleging is that another bidder besides ACE (ostensibly ACPL) might have won the exclusive rights to create the League. It does not—and cannot—allege that Defendants' actions led to a *reduction* in competition because USA Cricket would be awarding rights for a single league regardless of the challenged conduct.

*JetAway* is squarely on point. There, the plaintiff was the losing bidder for a contract to provide services to the Montrose Regional Airport, despite "guarantee[ing] a significantly higher payment to the County." 754 F.3d at 829. As ACPL alleges here, the plaintiff in *JetAway* claimed that the defendants engaged in "collusion in the RFP process" and selected the winning bidder "even before issuing the RFP." *JetAway*, 2012 WL 1044304, at *3. As a result, the plaintiff claimed that prices were higher, while the quality and quantity of services were lower. *JetAway*, 754 F.3d at 846. But because the plaintiff in *JetAway*, like ACPL, only alleged—at most—that it should be the one to have the exclusive rights that were being awarded, its claim that it "would have been a better monopolist for consumers" by virtue of providing more or better quality services was "legally infirm" because "it cannot be said that Defendants' conduct harmed *competition*." *Id*. at 847 (emphasis in original). In essence, ACPL is also asking the Court "to evaluate whether [ACPL] would have been a better monopolist," which is "akin to asking a court to decide what company *deserves* to be the monopolist in a given market, which is not an appropriate area of judicial inquiry under the antitrust laws." *Id*. at 848 (emphasis in original). Because ACPL's antitrust claims boil down to, at most, "I, rather than ACE, was entitled to be the monopolist," it cannot allege an antitrust injury, and its antitrust claims— Counts 1 through 4, and Count 5 (insofar as that count is based on a violation of antitrust law or

MOTION TO DISMISS

states a claim for unfair competition)—must all be dismissed with prejudice.

### 2.     ACPL's Section 1 Claim Is Fatally Defective

Beyond its fatal failure to allege antitrust injury, ACPL's claim that USA Cricket, the

ICC, the individual defendants, and ACE ("Section 1 Defendants") violated Section 1 of the

Sherman Act by excluding ACPL from the alleged "League Market" when it awarded ACE

exclusive rights to create the League must be dismissed for several independent reasons.

At the outset, the allegations are both implausible and internally contradictory. The

central theme of the Complaint, and the antitrust allegations in particular, is that the Section 1

Defendants allegedly conspired to set up a "sham" bid process, yet always intended to award

league rights to ACE. Compl. ¶¶ 92, 122, 128-31. However, ACPL never alleges that USA

Cricket needed to utilize an RFP or other type of bid process to select the entity that would form

the League. Since USA Cricket could have selected ACE without any RFP process and without

considering any other proposal, the conclusory proposition that Defendants actively conspired to

set in place a pre-determined bid process (much less the extensive one used) is neither factually

pled nor plausible. Separately, despite claiming that the Section 1 Defendants had no intention of

dealing with ACPL (*id.* ¶¶ 92, 129), ACPL concedes that it was invited to present its RFP

proposal in-person to USA Cricket (and was then invited to "re-present to the RFP committee").

*Id.* ¶¶ 82, 99 (alleging that USA Cricket offered ACPL "an opportunity to re-present to the RFP

committee in more detail" ACPL's "financial projections and proposed funding mechanisms").

Not only are ACPL's conclusory allegations that Defendants conspired to pre-select ACE

implausible, ACPL alleges a non-conspiratorial reason its bid was rejected—USA Cricket

purportedly "didn't really understand [ACPL's] proposal." *Id.* at ¶¶ 93-98. Given these

implausible and contradictory allegations, the Court should not infer conspiracy. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("courts should not … infer

MOTION TO DISMISS

conspiracies when such inferences are implausible").

Beyond the implausibility of the alleged conspiracy, dismissal of Count One is mandated by the fact that (1) the decision to declare ACE the winner of the RFP process is presumptively legal under the antitrust laws; and (2) based on ACPL's own allegations, the Section 1 Defendants did not have the separate economic interests necessary to make them liable for concerted actions under Section 1.

### a.       *Awarding ACE exclusive rights is "presumptively legal"*

ACPL claims the Section 1 Defendants violated the Sherman Act by allegedly excluding ACPL from the so-called "League Market,"—conduct it improperly labels a "group boycott." Compl. ¶ 129. This claim is based on allegations of a "phony" RFP process that prevented the selection of "the most robust and competitive T20 league offering." *Id.* ¶¶ 127-31. Thus, ACPL alleges the Section 1 Defendants conspired to award the bid to ACE *instead* of ACPL, not that they conspired to prevent ACPL from creating a competing T20 league.

While ACPL uses conclusory antitrust buzzwords, what ACPL has alleged, as a matter of law, is *not* a group boycott claim. A horizontal "group boycott,"—a *per se* violation of Section 1—"can only exist between conspirators who compete at the same market level." *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992). But here, the Defendants are not horizontal competitors. They are in a vertical relationship. The ICC accepted USA Cricket as its member national governing body for cricket in the United States, and USA Cricket, in turn, awarded ACE exclusive rights to partner with it to create a sanctioned professional T20 league. Compl. ¶¶ 35, 142; *see Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1510 (D. Colo. 1992) (vertical agreements involve "companies at different market levels in the chain of distribution," unlike horizontal agreements which involve "competitors at

the same market level"), *aff'd*, 13 F.3d 366 (10th Cir. 1993).[7]

ACPL also has not alleged a vertical group boycott, which is found "where there are joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *11 (D. Colo. Apr. 7, 2010) (citation omitted); *see also Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 641 (10th Cir. 1987) (plaintiff need not be "at the same market level" as competitors alleged to have conspired to group boycott, but "there must be concerted activity between two or more competitors at same market level"). Here, ACPL alleges that the Section 1 Defendants colluded to award rights to ACE instead of ACPL, but a "mere exclusionary agreement between businesses at different levels of competition" does not "constitute the type of 'vertical' agreement determined to be an illegal *per se* group boycott." *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 416 (D.D.C. 1998).

What is alleged here is akin to an exclusive distributorship, whereby a manufacturer grants a distributor the exclusive rights to distribute products or an exclusive licensing arrangement. By virtue of the ICC accepting USA Cricket as a member, USA Cricket has the exclusive rights to sanction cricket matches in the United States. USA Cricket, in turn, granted the RFP winner, ACE, exclusive rights to partner with it to create the League.

"[E]xclusive distributorship arrangements are presumptively legal." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997). In keeping with

---

[7] Elsewhere, ACPL asserts that Defendants' engaged in "bid-rigging," another misnomer. *See, e.g.,* Compl. ¶¶ 1, 7, 123. Unlike ACPL's allegations, bid-rigging involves "horizontal competitors who agree on which bidder will win the contest." *JetAway*, 2012 WL 1044304, at *3; *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989) (bid rigging scheme is an "agreement between competitors pursuant to which contract offers are to be submitted [to] or withheld from a third party"). Here there are no horizontal competitors among Defendants let alone an agreement among them as to which of them will win a bid.

MOTION TO DISMISS

those principles, "[t]he substitution of one distributor for another is not manifestly anticompetitive," *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1381 (10th Cir. 1988), because "[t]he antitrust laws are not designed to guarantee every competitor tenure in the marketplace." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987). Companies are "free to choose and terminate their distributors free of antitrust scrutiny so long as their motivation does not involve illegal pricing or tying arrangements." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1229 (10th Cir. 1986); *see also Bushie v. Stenocord Corp.*, 460 F.2d 116, 120 (9th Cir. 1972) (manufacturer is "free to agree with a third party to give him an exclusive distributorship even if this means cutting off another distributor" because "[t]o hold otherwise would be to 'saddle [defendant] with [plaintiff's] services forever'") (citations omitted; brackets in original).

> **b.**    ***ACPL's Section 1 claim fails because there are insufficient allegations of concerted action***

In the Section 1 context, a cognizable claim requires an agreement among two or more separate economic actors. *See Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). Moreover, the existence of an unlawful conspiracy must join together "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking.'" *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)). Based on the allegations of the Complaint, ACPL's claim of concerted action also fails.

As an initial matter, USA Cricket cannot conspire for purposes of Section 1 with the individual defendants, all of whom are directors or employees of USA Cricket. Section 1 "leaves untouched a single firm's anticompetitive behavior." *See Copperweld*, 467 U.S. at 775-76

MOTION TO DISMISS

(noting the absurdity of subjecting "a single firm's conduct … to [Section] 1 scrutiny whenever the coordination of two employees was involved"). A corporation acts through its officers and employees; thus, the officers and employees "are part of the same economic unit as the corporation for antitrust purposes" and are "generally incapable of conspiring with the corporation or with each other." *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir. 1983); *see also Copperweld*, 467 U.S. at 769 (holding that the officers and employees of the same firm do not provide the plurality of actors necessary for a Section 1 conspiracy.) Thus, "in the context of a board of director's day-to-day operating decisions," a company and its board of directors are "deemed part of the single entity so long as they act within the scope of their authority and for the benefit of the entity." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1202 (10th Cir. 2006). ACPL's allegations against USA Cricket are solely based on the actions of the individual defendants and the other USA Cricket board members not named in the complaint. While Defendants vigorously dispute, *inter alia*, the allegations made against the individual defendants, there is no allegation that the actions they took were outside the scope of their authority. Rather, ACPL has sued USA Cricket based on those alleged actions (as well as the alleged actions of others). Therefore, any claim that USA Cricket conspired with those individual defendants is not concerted action under Section 1 as a matter of law. *See Bell v. Fur Breeders Agric. Co-op.*, 348 F.3d 1224, 1234 (10th Cir. 2003).

As for an alleged conspiracy between USA Cricket and the ICC, although the two are separate organizations, "it is not determinative that two parties to an alleged Section 1 violation are legally distinct entities." *Am. Needle*, 560 U.S. at 196. Rather, the question is one of "competitive reality," i.e., "whether the agreement joins together independent centers of decisionmaking." *Id.* (citing *Copperweld*, 467 U.S. at 769). ACPL's own allegations make clear

MOTION TO DISMISS

that any alleged coordination between USA Cricket and the ICC does not rise to the level of concerted action under Section 1.

USA Cricket and the ICC are not competitors; rather, USA Cricket is an ICC member and has exclusive rights to promote events that may be sanctioned by the ICC in the United States. *See* Compl. ¶ 35. Indeed, the USA Cricket RFP process that forms the basis of ACPL's Section 1 claim was, according to the Complaint, expressly done with the full support of the ICC. *Id*. ¶¶ 71-73. As such, USA Cricket and the ICC clearly have not been pursuing competing economic interests with respect to cricket. ACPL itself alleges that the ICC and USA Cricket worked cooperatively, not as competitors, in developing cricket in the United States. *See, e.g.*, *id*. ¶¶ 54-57 (alleging ICC and the ICC Americas Project USA Team laid the groundwork for establishing USA Cricket); *id*. ¶¶ 61-62 (alleging "ICC provided, and continues to provide, nearly all the funding necessary to establish, promote, and operate USA Cricket" and continues to provide USA Cricket with "logistical and administrative support … on a regular basis."); *id*. ¶ 64 (alleging "USA Cricket could not sustain its operations without the financial, administrative, and logistical support of ICC."); *id*. ¶ 73 (the ICC "has committed to provide financial and human resources, knowledge, expertise, and guidance to USA Cricket across all of its key activities, including the development of this professional T20 league"); *id*. ¶ 77 (alleging "the ICC was materially involved in creating the RFP, executing the RFP Bid Process, and selecting a winner of the RFP Bid Process").[8]

Rather than supporting a conspiracy claim, ACPL's own allegations demonstrate a unity of interest between the ICC and USA Cricket and, by extension, the individual defendants.

---

[8] Although the ICC concurred with USA Cricket's judgment during the RFP process, Defendants dispute any allegation or claim that awarding ACE the bid was not USA Cricket's independent decision. However, that issue need not be resolved to decide this motion.

MOTION TO DISMISS

Nowhere in the complaint is there any allegation that the ICC and USA Cricket have separate or competing interests, or that any alleged coordination between the two deprived the marketplace of "independent sources of economic power previously pursuing separate interests." *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 432 (N.D. Cal. 1992) (finding no concerted action between a licensee and a patent holder jointly exploiting the patent in which they both held an interest); *Shionogi Pharma, Inc. v. Mylan, Inc.*, No. CV-10-1077, 2011 WL 2174499, at *2, *5 (D. Del. May 26, 2011) (noting that "parties with unified interests, such as a patent holder and licensee, are incapable of conspiring" for purposes of a Section 1 "coordinated activity" claim).[9]

### 3.  ACPL's Conspiracy To Monopolize Claim Fails As A Matter of Law

ACPL's claim under Section 2 of the Sherman Act not only fails because of the absence of antitrust injury and standing, but also falls of its own weight. In Count Two, ACPL alleges a confusing "conspiracy to monopolize" claim under Section 2 that appears to be derivative, or duplicative, of its flawed Section 1 claim.  ACPL claims that Defendants conspired to monopolize the alleged "Match Market," which it tries to distinguish from the alleged "League Market." *See* Compl. ¶¶ 115-20, 139. However, according to the Complaint, a "monopoly" in the Match Market would be an inevitable consequence of winning the bid to create a sanctioned league in the League Market. ACPL claims Defendants conspired to monopolize the "Match Market" by "creat[ing] an arbitrary and illusory RFP process," "corrupt[ing] the bidding process for the creation and operation of a T20 league," "disregarding [ACPL's] more financially generous RFP response, awarding Willow-backed ACE the exclusive rights to provide services

---

[9] ACPL amended its complaint to add ACE as a defendant to its Section 1 claim, even though it did not previously name Willow TV as a defendant in that claim and even though it knew that the allegedly "Willow-backed ACE" had been awarded the bid at the time it filed its initial complaint—indeed, that award forms the basis of ACPL's Section 2 claim. *See infra* IV.B.3. The late-addition of ACE does not save ACPL's Section 1 claim. Neither USA Cricket nor the ICC are competitors of ACE and USA Cricket's decision to award ACE exclusive rights is not the type of concerted action that deprives the marketplace of independent centers of decisionmaking.

MOTION TO DISMISS

in the Match Market, and excluding [ACPL] from further participation in the Match Market." Compl. ¶¶ 140, 142. Thus, it appears that, according to the Complaint, the award of the "League Market" "monopoly" automatically yields a "monopoly" in the "Match Market"—effectively rendering no distinction between the conduct that is the subject of the Section 1 and Section 2 claims or between the markets identified in those claims. Because ACPL's Section 2 claim is redundant of its Section 1 claim, it is subject to dismissal for the reasons set out above.

That dismissal is warranted is reaffirmed by a review of the elements of a conspiracy to monopolize claim: (1) the existence of a conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to monopolize. *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1233 (10th Cir. 2016). A conspiracy to monopolize claim requires that conspirators in their individual capacities committed themselves to a common plan to achieve an illegal objective. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002) ("A plaintiff must offer evidence tending to exclude the possibility that the alleged conspirators … acted independently."). Moreover, "[s]pecific intent to monopolize is the heart of a conspiracy [to monopolize] charge.'" *Id.* at 1024, n.10.

ACPL has not alleged any of these elements with respect to the claim that Defendants conspired to monopolize the so-called Match Market. The alleged misconduct that forms the basis of its Section 2 claim is USA Cricket's decision to award ACE rights to create the League, *i.e.*, conduct in the alleged *League Market*. As discussed above, ACPL's conspiracy allegations are implausible and contradictory as a general matter. *See supra* p. 15. Moreover, ACPL cannot plausibly allege there was a conspiracy, overt acts, or specific intent to monopolize, if monopolization of the Match Market is a necessary consequence of winning the right to create the league. *See, e.g.*, *In re NFL Sunday Ticket Antitrust Litig.*, No. 15-02668-BRO (JEMx), 2017

WL 3084276, at *19 (C.D. Cal. June 30, 2017) ("An exclusive distributorship agreement on its own … does not establish the specific intent to monopolize. … In other words, the fact that the NFL has a practical monopoly on professional football in the United States is not sufficient to establish that [the defendants] may be liable under section 2 for a conspiracy to monopolize."). Moreover, because ACPL's Section 2 claim is derived from a legal exclusive distributorship (*see supra* IV.B(2)(a)), it necessarily fails. *See Sheet Metal Duct, Inc. v. Lindab, Inc.*, No. 99-6299, 2000 WL 987865, at *6 (E.D. Pa. July 18, 2000) (where defendant "has a *legal* monopoly" and "perfectly permissible" exclusive distributorship agreement, "to allege that [defendants] have together … conspired to monopolize … cannot by itself be a claim under Section 2 of the Sherman Act") (emphasis in original). The Complaint is devoid of any allegation that Defendants committed other acts—besides awarding ACE the right to create the League—that allegedly monopolized the Match Market and, therefore, is devoid of factual allegations necessary to state a Section 2 claim.  ACPL's Section 2 conspiracy to monopolize claim should be dismissed.

### 4. ACPL's State Law Claims Fail For The Same Reasons Its Federal Antitrust Claims Fail

ACPL's Colorado and California antitrust claims are predicated on the same alleged conduct as ACPL's federal antitrust claims. Because ACPL fails to allege antitrust injury, *see supra* IV.B(1), the state law antitrust claims fail as well. *See Winther v. DEC Intern., Inc.*, 625 F.Supp. 100, 104 (D. Colo. 1985) (finding plaintiff lacked standing to bring state antitrust claim when he failed to allege a sufficient injury warranting standing under federal antitrust law); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009) (holding that "plaintiff[s] must prove antitrust injury" to have standing under the Cartwright Act) (citation omitted)). The state law antitrust claims also fail because Colorado and California antitrust laws are interpreted in line with federal law and no viable federal antitrust claims are stated in the

Complaint. *See, e.g.*, *Smalley*, 808 F. Supp. at 1516 (dismissing Colorado antitrust claims because there was no actionable Sherman Act claim); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) (dismissing Cartwright Act claims alongside Sherman Act claims because "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act").

## C. ACPL Fails To State A UCL Claim

To state a claim under Section 17200 of California's Unfair Competition Law ("UCL"), ACPL must establish that a practice is unlawful, unfair, or fraudulent. *See* Cal. Bus. & Prof. § 17200. ACPL's claim under each prong fails as a matter of law.

ACPL alleges that "Defendants violated the UCL's unlawful prong by … violating federal and state antitrust laws" and "interfering with American Cricket's existing and prospective business relationships." Compl. ¶ 162. The UCL borrows "rules set out in other laws and makes violations of those rules independently actionable." *Zhang v. Superior Court*, 57 Cal. 4th 364, 370, (2013) (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). Thus, it follows that "[w]here a plaintiff cannot state a claim under the 'borrowed' law, it cannot state a UCL claim either." *Golden v. Sound Inpatient Physicians Med. Grp., Inc.*, 93 F. Supp. 3d 1171, 1179 (E.D. Cal. 2015). ACPL fails adequately to plead antitrust or tortious interference claims. *See supra* IV.B and *infra* IV.D and IV.E. As such, its "unlawful" UCL claim fails as well. *See Krantz v. BT Visual Images, L.L.C.*, 89 Cal. App. 4th 164, 178 (2001) (UCL unlawful claim must "stand or fall depending on the fate of the antecedent substantive causes of action").

ACPL alleges "Defendants violated the UCL's unfair prong by … engaging in concerted actions designed to unreasonably restrain the League Market and the Match Market, by taking actions that significantly threaten or harm competition, and by engaging in monopolistic and/or

MOTION TO DISMISS

anticompetitive practices." Compl. ¶ 163. ACPL's UCL unfairness claim fails because ACPL cannot claim the alleged misconduct has an "actual or threatened impact on competition." *See Cel-Tech*, 20 Cal. 4th at 186-87. In a case such as this one, "unfair" conduct under the UCL "means conduct that threatens an incipient violation of an antitrust law … or otherwise significantly threatens or harms competition." *Id.* at 187. ACPL has not suffered antitrust injury and the alleged conduct by Defendants does not "threaten an incipient violation of an antitrust law." *See supra* IV.B. Therefore, such conduct is not "unfair" under the UCL.

ACPL's UCL claim under the fraud prong is based on the conclusory allegation that "Defendants … engag[ed] in a fraudulent scheme designed to induce [ACPL] into participating in the RFP Bid Process and preparing an RFP without disclosing that Defendants did not intend to follow an objective bid process." Compl. ¶ 164.[10] However, to state a UCL fraud claim, ACPL must allege facts showing that "[reasonable] members of the public are likely to be deceived." *See Rubio v. Capital One Bank*, 613 F. 3d 1195, 1204 (9th Cir. 2010) (alteration in original). This requires ACPL to allege "a likelihood of confounding" those "exercising ordinary care." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008). Thus, a claim based on the UCL's "fraudulent" prong triggers a heightened pleading requirement, requiring ACPL to "allege with particularity the circumstances constituting fraud." *See Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1198 (N.D. Cal. 2016). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); *see Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996) ("[T]he plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when

---

[10] This claim is also both implausible and contradicted by other allegations in the complaint. *See supra* p. 15.

MOTION TO DISMISS

it was said or written.'") (citing *Tarmann v. State Farm Mutual Auto. Ins. Co.,* 2 Cal. App. 4th 153, 157 (1991)). Here, ACPL fails to identify any misrepresentation with sufficient particularity. *See Jensen*, 425 F. App'x at 763 ("labels and conclusions … devoid of factual enhancement," and "broad, vague, and conclusory allegations" do not "meet the stricter requirements of Rule 9(b)") (internal quotation marks omitted)).

ACPL also has no available remedy under the UCL for a claim under the fraud prong. ACPL requests "damages and injunctive relief" for violations of the UCL. Compl., p. 48 (Relief Requested ¶ E). But an injunction prohibiting alleged misrepresentations about the RFP bid process is not possible because such conduct is not "ongoing or likely to recur." *See Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 465 (2005). The RFP process is completed. Compl. ¶ 111. Thus, ACPL cannot allege "ongoing" misrepresentations designed to induce participation in that process or that such misrepresentations are likely to be made again. As for damages, they "cannot be recovered" under the UCL because the statute only authorizes equitable relief. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).[11] Accordingly, ACPL's UCL claim under the "fraudulent" prong must be dismissed.

### D.   ACPL Fails To State A Claim For Tortious Interference With Prospective Business Advantage

ACPL alleges that the ICC tortiously interfered with its prospective business advantage by "instruct[ing] USA Cricket" to select ACE, and not ACPL, as the winner of its bid process. Compl. ¶¶ 167-68 (Count Six). Regardless of what state law governs,[12] this claim fails.

---

[11] Elsewhere, ACPL makes a passing reference to seeking restitution under the UCL. Compl. ¶ 165. But ACPL cannot seek restitution because an order of restitution requires a UCL defendant to "return money obtained through an unfair business practice to those persons in interest from whom the property was taken…." *Korea Supply*, 29 Cal. 4th at 1144. Defendants never obtained any money from ACPL so there is nothing to return. For the same reasons, ACPL does not have a UCL damages or restitution claim under the unlawful or unfair prongs either.

[12] ACPL purports to assert Counts Six through Eight pursuant to "various state law[s]" without specifying which state (or states) govern the claims. *See* Compl. ¶ 8. In "multistate tort controversies," federal courts sitting in

MOTION TO DISMISS

To state a claim for tortious interference with prospective business advantage under California law, ACPL must plead, *inter alia*, that it had an "exist[ing] … economic relationship" with USA Cricket. *See Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 511 (2017). It has not done so, nor could it. *See id*. at 511, 576 ("[i]t is antithetical to the principles of competitive bidding … that any bidder may expect probable future economic benefit[] …" because a solicitation for bids is "merely a request for offers").

To state such a claim under either Colorado or Nevada law, a plaintiff must sufficiently allege that (1) the defendant interfered with a prospective business relationship and (2) the purported interference was improper and done with the intent to harm the plaintiff. *See Drywave Techs. USA, Inc. v. Massage Int'l, Ltd.*, No. 16-cv-01775-MSK-NYW, 2017 WL 3086623, at *3 (D. Colo. Mar. 27, 2017) (plaintiff must demonstrate "intentional and improper interference such that a particular contract is prevented from being formed"); *TDN Money Sys., Inc. v. Global Cash Access, Inc.*, No. 2:15-CV-2197, 2016 WL 4157308, at *3 (D. Nev. Aug. 3, 2016) (claim "requires a showing of … intent to harm the plaintiff by preventing the relationship").

*First*, ACPL fails to allege that it had a prospective business relationship with USA Cricket. Such a relationship exists "only if there is a *reasonable likelihood or probability* that a contract would have resulted;" a "mere hope" is not enough.  *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995) (emphasis added); *see also Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1119-20 & n.11 (10th Cir. 2009) (plaintiff required to "prove that he had more than 'a mere hope' of entering into any future business deals" with third party); *MDM Grp. Assocs., Inc. v. CX*

---

Colorado must apply the law of the state with "the most significant relationship to the occurrence and the parties." *See Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 861 F. Supp. 2d 1256, 1269-70 (D. Colo. 2012) (citations omitted). As set forth herein, Counts Six through Eight fail under the law of each state with which ACPL has alleged *any* contact, *i.e.*, California, Colorado and Nevada. *See*, *e.g.*, Compl. ¶¶ 9-10, 12, 15, 20, 23-24, 63, 150-51, 153-56, 161-64.

MOTION TO DISMISS

*Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007) (plaintiff must show defendant's purported interference "prevent[ed] the formation of a contract between the plaintiff and a third party"); *Plaza Esteban v. La Casa Nino, Inc.*, 738 P.2d 410, 412 (Colo. App. 1987) (lack of a "firm offer" defeated claim), *rev'd on other grounds*, 762 P.2d 669 (Colo. 1988) (en banc).

ACPL alleges nothing more than a "mere hope" it would win USA Cricket's bidding process. Indeed, ACPL *admits* that it "kn[ew] it was not guaranteed to be selected as [the winning bidder]."[13] Compl. ¶ 7. Despite that, it claims to have had a "reasonable likelihood" of winning the RFP bidding process because (1) an unspecified number of unidentified USA Cricket board members purportedly "preferred [ACPL] over any other [bidder] and wanted USA Cricket to conduct further negotiations with [ACPL]"; and (2) in ACPL's own self-serving view, its proposal had "strength" and its principals, "experience." *Id.* ¶¶ 88, 169-70. Those allegations fail to indicate a "reasonable likelihood" of success in the bidding process. Notably, ACPL does not identify a single USA Cricket board member who voted in its favor or who would have done so. Nor does it, or can it, allege that those who purportedly "preferred" its bid constituted a majority (which would have been required for ACPL to win).[14] ACPL also does not—and cannot—allege that "further negotiations" with it would have resulted in its success. Indeed, as ACPL acknowledges, it *was* provided an opportunity to negotiate further—an opportunity given to it and ACE (*id.* ¶¶ 108, 170)—and ACPL refused (*id.* ¶ 111). Using ACPL's logic, every bidder has a "reasonable likelihood or probability" of winning. That, obviously, is not so.

*Second*, ACPL fails to sufficiently allege interference. It claims that the ICC "instructed"

---

[13] ACPL does not claim that even winning would entitle it to do more than try to reach a definitive agreement.

[14] In fact, ACPL's acknowledgement that a majority of the board (6 of 10 members) favored ACE (and not ACPL) controvert the notion that ACPL had a reasonable likelihood of winning the bid. *See* Compl. ¶¶ 3-5, 68-70, 88, 91, 124.

MOTION TO DISMISS

USA Cricket to choose ACE and not ACPL, but does not allege who was involved in any such communication, when or how it took place, whether it involved the actual decision-makers, or anything else to suggest the purported instruction could actually constitute interference. *See Twombly*, 550 U.S. at 557, 565 n.10 (factual allegations must "possess enough heft to 'sho[w] that the pleader is entitled to relief'" … the pleadings mentioned no specific time, place, or person involved in the alleged [conduct] …") (citation omitted).

*Third*, ACPL fails to allege that the ICC's purported interference was improper or that the ICC intended to cause ACPL any harm. The RFP expressly states that the ICC would have input in the process. Compl., Ex. D (Dkt. No. 1-4) at § 2 ("The ICC Board … has committed to provide … knowledge, expertise, and guidance to USA Cricket across all of its key activities, including the development of this professional T20 league."); *id.* at App'x A ¶ 3.2(D) (the purpose of USA Cricket includes, *inter alia*, "[t]o liaise with[] … the ICC … on matters pertaining to cricket in the United States"); *see supra* at p. 5. ACPL does not get to choose what that input is. Having seen the RFP's disclosure regarding the ICC's expected input, ACPL cannot now plausibly assert that any ICC input constituted "improper interference."

Further, ACPL's conclusory allegations that the ICC wanted to exclude ACPL from the U.S. cricket market because one of its principals is not a member of the "elite … castes" that allegedly control the sport in India (*see* Compl. ¶¶ 5, 46-47, 50-51, 181) are insufficient to allege impropriety. Even apart from its implausibility, ACPL fails to plead with any particularization that this was indeed the basis for the ICC's alleged views. *See id.* ¶ 51 (alleging merely that the ICC's chairman "made it clear" this was the case); *see also Iqbal*, 556 U.S. at 686 (bald allegation of discriminatory intent insufficient to plead discrimination).[15] Moreover, even if true,

---

[15] *See also, e.g.*, *Warne v. Hall*, 373 P.3d 588, 596 (Colo. 2016). In *Warne*, the plaintiff alleged that a Colorado mayor interfered with his contract to sell land to a drilling company by imposing unreasonable conditions on the

MOTION TO DISMISS

those allegations would not constitute improper conduct because parties are free to choose their

business partners. *See, e.g.*, *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825,

832 (9th Cir. 2001) ("the tort of interference with prospective economic advantage was not

intended broadly to limit individuals or commercial entities in choosing their commercial

relationships, whatever their motives in doing so might be—unless those motives are

independently unlawful"); *Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S.*

*Nev.*, 792 P.2d 386, 389 (Nev. 1990) (*per curiam*) (finding that absent evidence of unlawful

means, an entity is "free to give its business to whomever it wants").

### E.      ACPL Fails To State A Claim For Tortious Interference With Contract

ACPL alleges that the ICC improperly interfered with the obligation prescribed in

Section 11.4 of the License Agreement between GSV and USACA—two non-parties to this

action. Compl. ¶¶ 172-85 (Count Seven). Section 11.4 states:

> Upon the termination of this Agreement on account of the suspension of [*sic*]
> termination of USACA's membership with [the] ICC, USACA shall cause [the]
> ICC or [the] ICC's nominated body for the development of cricket in [the] USA,
> to execute the necessary agreements which shall have the effect of providing or
> continuing, as the case may be, the Licensed Rights to GSV, such that GSV's
> rights under this Agreement are not jeopardized in the event of suspension of [*sic*]
> termination of USACA's membership with [the] ICC.

*Id.*, Ex. C (Dkt. No. 1-3) § 11.4; *see also* Compl. ¶¶ 44, 176. In particular, ACPL alleges that the

ICC tortiously interfered with USACA's obligations under Section 11.4. *Id.* ¶¶ 176-80.

The elements of tortious interference with contract—which are substantively identical

under California, Colorado and Nevada law (*see supra* n.12)—require a plaintiff to plead that the

---

drilling company's development plans due to "malice" towards the plaintiff. *Id.* The Supreme Court of Colorado
dismissed a claim of tortious interference (in that case with contract), finding that "[e]ven assuming[] … that
[defendant mayor] stated she was not going to allow [the drilling company] to do business in [the town], … those
alleged statements do not plausibly suggest malice towards [plaintiff] any more than, or perhaps even as much as,
merely an objection to doing business with [the drilling company], whether justified on legitimate grounds or not."
*Id.* at 596-97.

MOTION TO DISMISS

defendant: (1) was aware of a valid, existing contract between the plaintiff and a third party, (2) intended that one of the parties breach that contract, and (3) through improper action (4) induced the party to breach, or made it impossible for the party to perform, the contract. *See Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004) (en banc); *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267-68 (Nev. 2003) (per curiam); *Augustine v. Trucco*, 124 Cal. App. 2d 229, 244-46 (1954). ACPL fails to state a claim under any of these state laws.

*First*, ACPL cannot satisfy the threshold element that there be a valid contract between *plaintiff* and a third party because ACPL does not—and cannot—allege that it was a party to, or an intended third-party beneficiary of, the License Agreement.[16] *See Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 981 (C.D. Cal. 2015); *Condo v. Conners*, 266 P.3d 1110, 1111-13, 1119 (Colo. 2011) (en banc); *Paul Steelman Ltd. v. HKS, Inc.*, No. 2:05-cv-01330-BES-RJJ, 2007 WL 295610, at *2 (D. Nev. Jan. 26, 2007).

ACPL tries to bypass this requirement by asserting that GSV, one of the License Agreement parties, "transferred all of the Licensed Rights granted under the [License] Agreement to [ACPL]." Compl. ¶ 53 n.1. That allegation fails because the gravamen of Count Seven is that *no Licensed Rights ever were granted under the License Agreement.*[17] Indeed, if the Licensed Rights *had* issued to GSV and ACPL *had* been assigned those rights, ACPL would, necessarily, already have the rights it seeks in this lawsuit. Moreover, the allegedly transferred

---

[16] The License Agreement explicitly states that the agreement has "No Third Party Beneficiaries." *See* Compl., Ex. C (Dkt. No. 1-3) § 17.3.

[17] As ACPL acknowledges, "the License Agreement provides that the Licensed Rights, among other rights, *would not become effective* 'unless and until [1] the Suspension [of USACA] … [wa]s lifted, terminate[d] or otherwise end[ed] … *and* [2] the ICC shall have approved USACA's grant of such rights to GSV.'" Compl. ¶ 42 (emphases added) (quoting License Agreement § 2.1.1). ACPL admits, as it must, that neither of those things occurred. *See id.* ¶ 53 ("[t]he ICC expelled USACA from its membership … prevent[ing] the License Agreement from going into effect—and thus … prevent[ing] [GSV] from automatically obtaining the Licensed Rights[]"); ¶¶ 48-49 (the ICC "undertook several steps to … prevent [GSV] from obtaining the Licensed Rights …").

MOTION TO DISMISS

rights themselves (defined in License Agreement § 3.1) do not include the right to enforce Section 11.4, which is the basis of ACPL's claim for tortious interference with the License Agreement.

*Second*, ACPL has failed to sufficiently allege that the License Agreement was breached (or interfered with) because ACPL has not—and cannot—allege that the condition precedent to the obligation that allegedly was breached was ever satisfied. *See R-G Denver, Ltd. v. First City Hldgs. of Colo., Inc.*, 789 F.2d 1469, 1474-76 (10th Cir. 1986) (rejecting tortious interference with contract claim where there was "no breach as a matter of law" due to the "[n]on-occurrence" of a condition precedent); *see also JPMorgan Chase Bank, N.A. v. KB Home*, 740 F. Supp. 2d 1192, 1197, 1199-200 (D. Nev. 2010) (no claim for tortious interference with contract absent a breach); *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 995 (Cal. App. 1977) (same). According to ACPL, USACA breached its obligation under Section 11.4 of the License Agreement by failing to cause the ICC or USA Cricket to issue the Licensed Rights. Compl. ¶¶ 177-80. But that obligation never arose.

USACA's obligation in Section 11.4 to cause the License Rights to issue could arise only "upon the termination of [the License Agreement] on account of the suspension o[r] termination[18] of USACA's membership with [the] ICC." *Id.*, Ex. C (Dkt. No. 1-3) § 11.4. Tellingly, *nowhere does ACPL allege that the License Agreement was in fact terminated*, much less for the reasons required in Section 11.4. Nor could ACPL so allege. Termination of the License Agreement for the reasons referenced in Section 11.4 (suspension or termination of USACA's membership in the ICC) is addressed in the immediately preceding provision, Section

---

[18] The License Agreement actually refers to suspension "of" termination, but that is clearly a typographical error. Common sense and a contextual reading of the License Agreement—and indeed ACPL's Complaint (*see* Compl. ¶ 44)—make clear that the phrase was meant to read "suspension or termination."

MOTION TO DISMISS

11.3. That provision states, in relevant part, that "GSV may terminate this Agreement on notice to USACA *if during the License Term*[] … USACA's ICC membership is suspended or terminated[]." *Id.*, Ex. C (Dkt. No. 1-3) § 11.3 (emphasis added). However, USACA's ICC membership could not have been suspended or terminated "during the License Term" because the "License Term" as defined in the License Agreement indisputably never commenced.

Specifically, the "License Term" could commence if and only if the ICC reinstated USACA, whose ICC membership had been suspended at the time the parties entered into the License Agreement. *See id.,* Ex. C (Dkt. No. 1-3) § 4.1 ("the term of USACA's grant of the Licensed Rights … shall begin on the first day of the month *following the date on which the ICC Reinstatement occurs*") (emphasis added). Section 11.3 thus refers to USACA's possible suspension again (or expulsion) *after* it had been reinstated, if in fact it ever was reinstated. However, ACPL admits, as it must, that reinstatement never occurred. *Id.* ¶¶ 49, 52-53. Accordingly, the condition precedent to the existence of USACA's purported obligation in Section 11.4 did not occur, and as such there could be no breach of that obligation.

*Third*, ACPL cannot allege interference (much less *improper* interference) because USACA had no entitlement to cause the Licensed Rights to issue from third parties, *i.e.*, the ICC or USA Cricket. Under New York law, which governs the License Agreement (*see id.*, Ex. C (Dkt. No. 1-3) § 17.1), it is "axiomatic that one party to a contract cannot shift liability for its breach to a third party simply by conditioning its contractual obligation on some action or inaction by the third party." *Ambase Corp. v. City Inv'g Co. Liquidating Tr.,* No. 01 CIV. 10761 (RJW), 2002 WL 1482619, at *3 (S.D.N.Y. July 9, 2002); *see also Goldenberg v. Bartell Broad. Corp.*, 47 Misc. 2d 105, 108 (N.Y. Sup. 1965) ("[p]arties to a contract … cannot validly cast the obligation of the terms of such contract upon a third party"); *New York Tel. Co. v. Teichner*, 329

33

N.Y.S.2d 689, 690-91 (Dist. Ct. 1972) ("'The obligation of contracts is in general limited to the parties making them … Parties to a contract cannot impose any liability upon a stranger to the contract under its terms.'") (quoting 10 N.Y. Jur. Contracts § 231).

The parties to the License Agreement (USACA and GSV) could not, as ACPL claims Section 11.4 does, impose any obligations upon non-parties the ICC or USA Cricket to issue the Licensed Rights to GSV. Indeed, under the License Agreement, the Licensed Rights could not be issued to GSV absent approval from the ICC. Compl., Ex. C (Dkt. No. 1-3) § 2.1.1. Thus, the parties to the License Agreement recognized that the ICC had the right to decline to approve any such issuance. ACPL cannot allege interference based on the ICC's or USA Cricket's "refusal" to do what they were not obligated to do. *See, e.g.*, *Dryden*, 65 Cal. App. 3d at 996 ("it is well established that no actionable wrong is committed where, as here, the defendant's conduct consists of something which he had an absolute right to do").

*Finally*, ACPL's claim also fails because it is based on conclusory, implausible allegations in contravention of *Iqbal* and *Twombly*. ACPL provides no factual basis to support its claim that the ICC interfered with USACA's purported obligation under Section 11.4 to obtain the Licensed Rights from the ICC or USA Cricket. There is not a single allegation as to when, where or how USACA attempted to obtain those rights, or who specifically was involved in doing so. Nor is there any allegation as to when, where or how the ICC allegedly acted to thwart any such attempt, or who specifically did so.[19] Moreover, ACPL's conclusory allegation that the ICC acted because one of ACPL's principals was not a member of India's "elite castes" is as insufficient to allege the requisite impropriety here as it is for Count 6. *See supra* at pp. 29-30.

---

[19] While ACPL alleges that GSV's principal, Jay Pandya, attempted to obtain the rights from the ICC (Compl. ¶¶ 50-51, 173-74), it does not allege that USACA made any effort to do so.

MOTION TO DISMISS

### F.      ACPL Fails To State A Claim For Civil Conspiracy

ACPL's Count Eight is for civil conspiracy (*see* Compl. ¶¶ 186-90), a cause of action that cannot stand alone. *See Peterson v. Miranda*, 57 F. Supp. 3d 1271, 1278 (D. Nev. 2014) (claim requires "the commission of an underlying tort"); *Shell v. Am. Family Rights Ass'n*, 899 F. Supp. 2d 1035, 1063 (D. Colo. 2012) (civil conspiracy "is not independently actionable"); *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062 (2006) ("[A] civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed."). Here, the civil conspiracy claim, like the claim for tortious interference with contract, is based on supposed interference with USACA's obligations under Section 11.4 of the License Agreement. *See* Compl. ¶¶ 187-89. Accordingly, ACPL's civil conspiracy claim fails for the same reasons set forth in IV.E.

## V.      CONCLUSION

ACPL fails to allege Article III standing. Moreover, all of its claims are fatally deficient and, thus, fail to state a claim. Because ACPL has already amended its complaint once, cannot cure any of these deficiencies by further amendment—and did not attempt to do so when apprised of them—Defendants respectfully request that this Court dismiss ACPL's Complaint with prejudice.

Dated:  July 24, 2019

MOTION TO DISMISS

SCHULTE ROTH & ZABEL LLP

By: /s/ *Alan R. Glickman*
Alan R. Glickman
Harry S. Davis

919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2222
Facsimile: (212) 593-5955
Email: alan.glickman@srz.com
Email: harry.davis@srz.com

BRYAN CAVE LEIGHTON PAISNER LLP

Timothy R. Beyer
1700 Lincoln Street, Suite 4100
Denver, Co 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200
Email: tim.beyer@bclplaw.com

*Attorneys for International Cricket Council*

DHILLON LAW GROUP INC.

By: /s/ *Nitoj P. Singh*
Nitoj P. Singh

177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
nsingh@dhillonlaw.com

LEWIS ROCA ROTHGERBER
CHRISTIE LLP

Caitlin McHugh
1200 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone: (303) 628-9588
cmchugh@lrrc.com

*Attorneys for Willow TV International,*
*American Cricket Enterprises, Inc., and*
*Cricket Acquisition Corporation*

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Sujal J. Shah*
Sujal J. Shah
Rishi P. Satia

One Market Street
Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile: (415) 442-1001
sujal.shah@morganlewis.com
rishi.satia@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP

Daniel S. Savrin
One Federal Street
Boston, MA 02110-1726
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: daniel.savrin@morganlewis.com

*Attorneys for USA Cricket and Individual*
*Defendants*

SHERMAN & HOWARD L.L.C

Stephen A. Hess, Esq. (#16899)
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903-4015
Telephone: (719) 475-2440
Facsimile: (719) 635-4576
Email: shess@shermanhoward.com

*Attorney for USA Cricket*

MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I certify that on July 24, 2019, a true and correct copy of the foregoing **DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT [DKT. NO. 39-1] PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Adam Jeremy Biegel, Esq.
Austin Allyn Burrows Ownbey, Esq.
Alston & Bird LLP
950 F Street NW
The Atlantic Building
Washington, DC 20004-1404
Email: adam.biegel@alston.com
austin.ownbey@alston.com
*Attorneys for Plaintiff American Cricket Premier League, LLC*

Christopher J. Borchert, Esq.
Karl Geercken, Esq.
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
Email: christopher.borchert@alston.com
karl.geercken@alston.com
*Attorneys for Plaintiff American Cricket Premier League, LLC*

James Edward Hartley, Esq.
Adam A. Hubbard, Esq.
Holland & Hart LP
1800 Broadway
One Boulder Plaza, Suite 300
Boulder, CO 80302
Email: jhartley@hollandhart.com
aahubbard@hollandhart.com
*Attorneys for Plaintiff American Cricket Premier League, LLC*

Stephen A. Hess, Esq.
SHERMAN & HOWARD L.L.C.
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903-4015
Telephone: (719) 475-2440
Facsimile: (719) 635-4576
E-Mail: shess@shermanhoward.com
*Attorneys for USA Cricket*

*s/Laresa Brow*n
Laresa Brown