**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-1521-WJM-KMT

AMERICAN CRICKET PREMIER LEAGUE, LLC,

      Plaintiff,

v.

USA CRICKET, a Colorado Non-Profit Corporation,
INTERNATIONAL CRICKET COUNCIL,
WILLOW TV INTERNATIONAL, INC.,
CRICKET ACQUISITION CORPORATION,
AMERICAN CRICKET ENTERPRISES, INC.,
PARAAG MARATHE,
AVINASH GAJE,
VENU PISIKE,
ATUL RAI,
NADIA GRUNY,
ERIC PARTHEN, and
JOHN DOES 3–10,

      Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

      Plaintiff American Cricket Premier League, LLC ("Plaintiff"), alleges that a corrupt

bidding process prevented fair consideration of its bid to create an internationally

recognized cricket league in the United States.  Plaintiff brings claims under federal

antitrust law and related state laws against the various entities and individuals

(collectively, "Defendants") that Plaintiff believes are responsible for the alleged

corruption.

      Currently before the Court is Defendants' Joint Motion to Dismiss.  (ECF No. 56.)

For the reasons explained below, the Court grants the motion without prejudice for lack

of subject matter jurisdiction.  More specifically, the Court lacks jurisdiction under Article III of the U.S. Constitution to adjudicate Plaintiff's federal antitrust claims because there is no prospective relief this Court can grant that will remedy Plaintiff's claimed injury; the Court lacks Article III jurisdiction to adjudicate Plaintiff's state-law claims for the same reason; and the Court otherwise lacks statutory subject matter jurisdiction to adjudicate Plaintiff's state-law claims because Plaintiff has failed to plead diversity of citizenship.

## I.  LEGAL STANDARD

Defendants bring their motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), and alternatively under Rule 12(b)(6).  (*See* ECF No. 56 at 18–19.)[1]  The Court finds that Rule 12(b)(1) controls under the circumstances of this case.

Rule 12(b)(1) permits a party to move to dismiss for "lack of subject-matter jurisdiction."  "[Federal] [d]istrict courts have limited subject matter jurisdiction and may [only] hear cases when empowered to do so by the Constitution and by act of Congress."  *Randil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted).  "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  A facial attack questions the sufficiency of the complaint as to its subject matter jurisdiction allegations.

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with separately paginated prefatory material such as a table of contents.

*Id.* In reviewing a facial attack, courts accept all well-pleaded allegations as true, as in a Rule 12(b)(6) setting. *Id.* A factual attack, by contrast, "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* at 1003.

In this case, Defendants bring a facial attack, so the Court cannot stray from the allegations of the complaint (and any attachments, *see* Fed. R. Civ. P. 10(c)).[2]

## II. FACTS

The Court accepts the following as true for purposes of resolving Defendants' motion. All "¶" citations, without more, are to Plaintiff's Corrected Complaint and Jury Demand (ECF No. 51).

The international governing body for cricket is Defendant International Cricket Council ("ICC"). (¶¶ 32, 35.) "ICC recognition is crucial for any professional cricket league to be viable and internationally recognized." (¶ 32.) "Players that want to compete in ICC-sanctioned international events, or for any of the other ICC-sanctioned events, will not participate in a league that is not sanctioned by the ICC because they risk losing their ability to play in future ICC matches." (¶ 34.) In 1965, the ICC approved the United States of America Cricket Association ("USACA") (not a party here) as the national-level governing body for cricket in the United States. (¶ 36.)

In 2016, USACA announced plans to launch a "T20 professional cricket league in the United States." (¶ 37.) T20 is short for "Twenty20," a cricket format "designed in the mid-2000s as a faster-paced, flashier version of the game." (¶ 27.) T20 "allows for a

---

[2] There are exceptions to the face-of-the-complaint rule. *See, e.g., Toone v. Wells Fargo Bank, N.A.,* 716 F.3d 516, 521 (10th Cir. 2013). Nothing in this case requires the Court to examine whether those exceptions might apply.

single contest to be played efficiently in about three hours," as compared to "Test matches (lasting 5 days) and One-Day Internationals (lasting on average more than 8 hours)." (¶ 28.)

Plaintiff is a Delaware LLC headquartered in Las Vegas, Nevada. (¶ 9.) One of its principals is Jay Pandya ("Pandya"). (¶ 9(a).) He is "an experienced businessperson and cricket executive," including through his ownership of a professional cricket team in St. Lucia. (*Id.*) Pandya is also chairman and founder of non-party Global Sports Ventures ("Global"). (*Id.* ¶¶ 9(a), 38.) USACA selected Global "as its partner to do the commercial development work necessary to establish and operate [a] professional U.S. T20 cricket league." (¶ 38.)

In September 2016, Global entered into the "License Agreement" with USACA. (¶ 39.) The License Agreement granted Global the "exclusive right" to establish "the only USACA sanctioned and ICC approved professional T20 league" in the United States. (¶ 41 (internal quotation marks omitted).) However, USACA was under ICC suspension at the time. (¶ 42.) The License Agreement accordingly "provide[d] that the Licensed Rights, among other rights, would not become effective 'unless and until the Suspension . . . is lifted, terminates or otherwise ends . . . and the ICC shall have approved USACA's grant of such rights to [Global].'" (*Id.*)

The ICC did not want Pandya involved in any ICC-sanctioned cricket league. (¶ 46.) "The ICC's desire to exclude Global and Mr. Pandya [was] based in large part on the fact that Mr. Pandya is not part of the incumbent and traditional Indian business and social circles that dominate Indian cricket and the ICC worldwide." (¶ 47.) But the ICC knew that reinstatement of USACA would lead to Global's recognition as the

USACA-sanctioned (and therefore, apparently, the ICC-sanctioned) organizer of T20 cricket in the United States. (¶ 46.)[3] The ICC therefore "placed numerous new conditions on lifting USACA's suspension." (¶ 49.) "The new conditions imposed by the ICC were arbitrary, designed to be nearly impossible for USACA to comply with[,] and were intended solely to justify ICC expelling USACA and thereby excluding Global from the T20 cricket market in the United States." (*Id.*)

The ICC formally expelled USACA in June 2017. (¶ 52.) This "prevent[ed] the License Agreement from going into effect." (¶ 53.) At some later (unspecified) time, Global "transferred all of the Licensed Rights granted under the USACA Licens[e] Agreement to [Plaintiff]." (*Id.* n.1.)[4]

The ICC soon assisted in creating Defendant USA Cricket, a new entity headquartered in Colorado Springs that was to replace USACA as the national-level governing body for cricket in the United States. (¶¶ 54–57.) USA Cricket officially launched in September 2017 and formally applied for ICC membership in December 2017. (¶¶ 58–59.)

USA Cricket then began the process of organizing its first board of directors. (¶¶ 65–67.) The board was to have ten members, with seven to be elected. (¶ 60.)

---

[3] The Court says "apparently" because, as noted, the License Agreement contains a clause contemplating the need for ICC approval of the rights granted by USACA to Global—thus casting doubt on whether USACA's reinstatement would have automatically given ICC imprimatur to Global.

[4] Plaintiff does not explain what rights persist after USACA's expulsion from the ICC. The License Agreement contains a clause that contemplates "termination of USACA's membership with ICC" and requires USACA to "cause ICC or ICC's nominated body for the development of cricket in USA, to execute the necessary agreements which shall have the effect of providing or continuing, as the case may be, the Licensed Rights to [Global]." (¶ 44.) But it is unclear what right USACA has or had to cause the ICC or any successor governing body in the United States to enter into an agreement with Global.

Defendants Gaje, Pisike, Rai, and Gruny ran for board membership, and Defendants

Willow TV International ("Willow") and Cricket Acquisition Corporation ("CAC") "paid for

substantially all of [their] campaign expenses." (¶ 68; *see also* ECF No. 51 at 1.)

Willow and CAC are "entities owned and run by affiliates of the influential Times Group

of India (a key sponsor of ICC-sanctioned events in India and elsewhere)." (¶ 68.)

Gaje, Pisike, Rai, and Gruny each won a board seat (becoming what Plaintiff

calls the "Conflicted Board Members"). (¶ 70.) It is not clear who won the other three

elected positions. However, the remaining three members of the ten-member board

were appointed by USA Cricket's "Nominating and Governance Committee," which was

beholden to ICC interests. (¶¶ 65, 70.) Those three non-elected board members were

therefore similar in their loyalties to the four Conflicted Board Members, meaning "there

was now a clear majority of the Board beholden to ICC-friendly interests." (¶ 70.)

In November 2018,

> USA Cricket announced the United States Professional T20
> League RFP (the "RFP"), which sets forth the parameters of
> USA Cricket's purported competitive bidding process for
> selection of a commercial partner (the "RFP Bid Process").
> The RFP states that "USA Cricket is looking for a partner to
> help capitalize on [America's] interest levels in the sport and,
> specifically, to construct, fund, launch and operate the first
> professional T20 cricket league (the 'League') in the United
> States."

(¶ 71 (citations omitted).)

Plaintiff decided to bid for this opportunity, and therefore submitted a timely RFP

response in January 2019. (¶ 79.) Plaintiff's RFP included, among other things,

"$8 million in guaranteed compensation to USA Cricket for each of the first two years

and a total of $516 million in guaranteed financial compensation over a period of 25

years." (¶ 80.)

Defendant American Cricket Enterprises ("ACE") also submitted a timely bid. (¶ 81.) ACE had "backing from . . . the founder and CEO of Willow and CAC, and [from] the principals of The Times Group of India." (*Id.*) "USA Cricket began negotiating [secretly] with Willow-backed ACE almost immediately afterwards." (*Id.*) It strung Plaintiff along, however, by announcing that it would issue a "set of standard questions" to "all bidders" (which it never did), and by allowing Plaintiff to give a presentation "to a partial group of the USA Cricket Board." (¶¶ 81–82.) That took place sometime in February or early March 2019 and was, from Plaintiff's perspective, *pro forma*. (¶ 82.)

In mid-March 2019, USA Cricket informed Plaintiff that it "had selected another Proposer," which turned out to be ACE. (¶ 83.)

> Based on subsequent conversations with individual
> members of USA Cricket's Board of Directors and other USA
> Cricket officials that reached out to [Plaintiff] to express
> concerns about the integrity of the RFP process, [Plaintiff]
> learned that its RFP Response was superior to every other
> response on every objective metric and included a far more
> comprehensive infrastructure and economic development
> plan than any other Proposer.

(¶ 86.) In particular, Plaintiff learned that ACE had offered "a mere $2 million in financial contribution for each of the first two years (hundreds of millions of dollars less over the course of 25 years than [Plaintiff] guaranteed)." (¶ 87.)

> [Plaintiff] also learned from members of USA Cricket's Board
> of Directors that certain Board members preferred [Plaintiff's]
> proposal over that of any other Proposer and had wanted
> USA Cricket to conduct further discussions and negotiations
> with [Plaintiff] rather than make the rapid award to Willow-
> backed ACE. But those Board members were denied the
> opportunity to engage in such discussions . . . because they
> were told that the leadership of USA Cricket and the ICC had
> already decided who was going to win the RFP process.

(¶ 88.)

Given what Plaintiff had learned, Plaintiff contacted USA Cricket in late March 2019 to ask how ACE's proposal could have won out over Plaintiff's. (¶ 93.) USA Cricket responded by "challeng[ing] the veracity of [Plaintiff's] financial commitments contained in the RFP Response." (¶ 94.) In other words, it appears that USA Cricket did not believe (or at least *said* it did not believe) Plaintiff's representations with respect to guaranteed compensation. This led to further communication in which it became clear that Plaintiff's guarantee of certain compensation was a bank guarantee. (¶ 96.)

USA Cricket then offered Plaintiff "an opportunity to re-present to the RFP committee in more detail." (¶ 99 (internal quotation marks omitted).) However, USA Cricket demanded that Plaintiff sign what were called the "New Terms of Engagement." (¶ 100.) The New Terms of Engagement were, in essence, a prospective release of any claims the bidder might have against USA Cricket based on the bidding process. (¶¶ 101–06.)

Plaintiff refused to sign the New Terms of Engagement, "effectively ending its ability to be formally considered by USA Cricket." (¶ 111.) "On May 23, 2019, USA Cricket formally announced that it had selected ACE as its strategic partner." (*Id.*)

Plaintiff filed this lawsuit on May 28, 2019 (ECF No. 1) alleging eight claims for relief:

- *per se* violation (group boycott), or at least a rule-of-reason violation, of section 1 of the Sherman Act, 15 U.S.C. § 1 ("Count 1");

- monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 ("Count 2");

- violation of Colorado Revised Statutes § 6-4-104, which is Colorado's

equivalent to section 1 of the Sherman Act ("Count 3");

- violation of California's antitrust proscriptions, *i.e.*, the Cartwright Act, Cal. Bus. & Prof. Code § 16720 ("Count 4");[5]

- violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("Count 5");

- tortious interference with prospective business advantage ("Count 6");

- tortious interference with contract, referring to the License Agreement between USACA and Global ("Count 7"); and

- civil conspiracy ("Count 8").

(*Id.* at 35–50.)

In July 2019, Plaintiff filed the currently operative complaint, *i.e.*, the Corrected Complaint and Jury Demand (ECF No. 51). It alleges the same eight causes of action. (*Id.* at 33–47.) The complaint is "corrected" in the sense that it substitutes the correct names for certain defendants. (*See* ECF No. 39.)

All Defendants have jointly moved to dismiss. (ECF No. 56.)

## III. ANALYSIS

### A. Federal Antitrust Claims (Counts 1 & 2)

Section 4 of the Clayton Act authorizes private plaintiffs to sue for violations of federal antitrust laws. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."). To pursue such claims, a plaintiff must have standing to sue under Article III

---

[5] Several Defendants are domiciled in California (*see* ¶¶ 12–14, 18) and Plaintiff alleges that "Defendants' combination, trust, or conspiracy was substantially carried out and effectuated within the State of California" (¶ 153).

of the U.S. Constitution (like all plaintiffs in federal court), and also have "antitrust standing." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). These are separate inquiries, and "the standing requirements in the antitrust context [are] more rigorous than that of the Constitution." *Id.*

The principles of Article III standing, although less rigorous that antitrust standing, dispose of Plaintiff's federal antitrust claims. The principles of antitrust standing—particularly "antitrust injury"—are nonetheless helpful to understanding the Article III infirmity, so the Court partially addresses antitrust standing as well.

     1.   <u>Article III Standing</u>

Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies." *See* U.S. Const. art. III, § 2, cl. 1. These words have been interpreted to restrict federal courts from giving "advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties," *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain

alterations incorporated). "Article III standing is jurisdictional . . . ." *In re Peeples*, 880

F.3d 1207, 1212 (10th Cir. 2018).

Plaintiff's complaint raises serious questions as to injury-in-fact as it connects to

redressability. Plaintiff pleads that

> [t]he rushed and conflicted bidding process robbed [it] of an
> opportunity to compete fairly for the right to make an ICC-
> sanctioned cricket league a reality in the United States.
>
> [Plaintiff] knows it was not guaranteed to be selected as a
> commercial business partner of USA Cricket and the ICC.
> But it was entitled to a fair bidding process.

(¶¶ 6–7.) In other words, Plaintiff asserts what is sometimes called "procedural injury."

*Lujan*, 504 U.S. at 573 n.7.

In light of Plaintiff's concessions that it can only ask for a "fair bidding process,"

and not for an order that USA Cricket accept Plaintiff's bid instead of ACE's,

Defendants' motion specifically challenges the viability of such a procedural injury in this

context, and also whether this Court can enter any order redressing it. (ECF No. 56 at

20–21.) In response, Plaintiff asserts that its burden to plead standing at this phase is a

"lightened" one, and Plaintiff then reiterates that it "has lost the opportunity to fairly

compete for, and likely win if judged objectively, some or all of the rights to commercially

develop an ICC-sanctioned U.S. cricket league." (ECF No. 64 at 22–23.)[6] As for

---

[6] Plaintiff also asserts two other injuries, neither of which is relevant to the present analysis. First, Plaintiff alleges that it was injured by the ICC's interference with the License Agreement between USACA and Global. (*Id.* at 23.) That allegation, if true, would be relevant to Plaintiff's standing to pursue its contractual interference claim (Count 7). But the Supreme Court has rejected any "commutative" theory of standing, by which a plaintiff borrows the injury of one cause of action in an effort to sustain standing in another. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *Id.* Second, Plaintiff alleges that its "investments of time and money (including the hiring of and payments to experts that were part of its RFP Response) were wasted by this rigged process." (ECF No. 64 at 23.) Plaintiff did not allege as much in its complaint, however, and "[p]laintiffs cannot rectify their pleading deficiencies by asserting new facts in an opposition

redressability, Plaintiff says it "is not asking the Court to award the bid to [it] or force USA Cricket to partner with [it]. [It] is seeking an injunction to halt implementation of an RFP Process infected by anticompetitive conduct until it is cleansed of Defendants' misconduct." (*Id.* at 24.)

Plaintiff conspicuously cites no case in which its theory of injury and redressability has been accepted. Nor could the Court find any such case.

As far as the Court is aware, "procedural injury" is viable, if at all, only in unique circumstances that have no obvious application here. One is in the administrative law context, and specifically as it relates to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq.*, which requires federal agencies to consider the environmental impacts of their actions. There, it is usually enough to argue that requiring the agency to redo its environmental analysis might lead to a better outcome for the plaintiff, even though it is not guaranteed to do so. *See Zeppelin v. Fed. Highway Admin.*, 305 F. Supp. 3d 1189, 1198–99 (D. Colo. 2018). This is considered "a special relaxation of the normal standards for redressability and immediacy." *Id.* at 1198 (internal quotation marks omitted).

Another unique context in which something like "procedural injury" is a viable basis for standing is a challenge to affirmative action. In such a challenge, there is no guarantee that, *e.g.*, the bidder for a government contract would be selected, or the applicant to a state university would be admitted, even if consideration of minority status was eliminated from the process. Rather, "an allegation that some discriminatory

---

to a motion to dismiss." *Smith v. Pizza Hut, Inc.*, 694 F. Supp. 2d 1227, 1230 (D. Colo. 2010). In any event, although damages are a classic Article III injury and usually redressable by a money judgment, these kinds of damages would not amount to an "antitrust injury," as explained below.

classification prevented the plaintiff from competing on an equal footing" is enough. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993).

In both of these types of cases (NEPA and affirmative action), a major reason why redressability still exists is that the court can order the defendant to do something that will have a real-world effect. If a court finds that an agency failed to discharge its NEPA duties adequately, the court must "hold unlawful and set aside agency action." 5 U.S.C. § 706(2); *see also Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 690 (10th Cir. 2010) (NEPA enforced through the Administrative Procedure Act). At that point, if the agency still wants to go forward, it is statutorily *required* to redo the NEPA process. *See* 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1501.4.

The affirmative action context is slightly more complicated because, for example, it is not always a legal requirement that a government award contracts through competitive bidding. But if a court is satisfied that that the government will continue to award contracts through competitive bidding and that the plaintiff will continue to bid for those contracts, redressability is satisfied. *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 212 (1995) (plurality op.) ("Because the evidence in this case indicates that the [government] is likely to let contracts involving guardrail work that contain a subcontractor compensation clause at least once per year in Colorado, that Adarand is very likely to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses, we are satisfied that Adarand has standing to bring this lawsuit.").

Finally, in the educational affirmative action setting, redressability is generally

maintained by certifying a class of both present and future applicants to the educational institution.  *See Gratz v. Bollinger*, 539 U.S. 244, 260–68 (2003).  Because there is generally no question that the institution would, or even could, stop assembling its incoming class through a competitive application process, a class action preserves the possibility of meaningful prospective relief even if—as is likely—the original plaintiffs will enroll in a different school, and perhaps even graduate, while the lawsuit is pending.  *Cf. Texas v. Lesage*, 528 U.S. 18, 21 (1999) (in affirmative action cases, as elsewhere, there must be an "allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief").

The Court's research has revealed no similar form of relief in the antitrust context.  The reason is simple, and it goes deeper than Plaintiff's concession that "it was not guaranteed to be selected as a commercial business partner of USA Cricket and the ICC."  (¶ 7.)  The fundamental problem, as stated in Plaintiff's own words, is that "Defendants could have awarded the exclusive rights to develop the cricket league without an RFP Process."  (ECF No. 64 at 38; *see also id.* at 31 (asserting essentially the same).)  If Defendants could have done so, then what is to stop Defendants from doing so even if this Court grants precisely the injunction Plaintiff requests?  That proposed injunction is as follows:

> Preliminarily and permanently enjoin [Defendants] from (i) taking any further action to support or implement their selection of a winner in connection with the corrupted RFP Bid Process described herein; (ii) excluding [Plaintiff] from, or failing to give objective and unbiased consideration to [Plaintiff] in, any current or future selection process in connection with a professional T20 cricket league in the U.S.; and (iii) using unfair practices in any selection process or implementation of their programs in connection with a professional T20 cricket league in the U.S.

(ECF No. 51 at 47–48; *see also* ECF No. 64 at 24 (affirming that this is the relief that Plaintiff believes satisfies the Article III redressability requirement).)

This language is already notable for use of terms like "any current or future selection process"—seemingly an implicit admission that there might not be another selection process.  But most notable is what Plaintiff does *not* ask for, namely, *an order that Defendants re-bid the contract.*  Plaintiff does not ask for that relief likely because Plaintiff cannot find any authority supporting the Court's ability to enter such an order.

To be sure, Plaintiff says that "Defendants could have awarded rights to develop the cricket league without an RFP Process, *but USA Cricket chose to avail itself of the benefits of an apparently competitive process.*"  (ECF No. 64 at 31 (emphasis added).) The implication appears to be that there is some point-of-no-return, beyond which one is irrevocably committed to a bidding process that may be judicially evaluated after the fact for fairness.  But Plaintiff never actually says as much, nor cites any authority supporting the implication.

Conceivably, Congress could "loosen the strictures of the redressability prong" by granting a procedural right in the antitrust context, as it has in the environmental context.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  But Congress has not done so.  Indeed, case law about "antitrust injury" makes fairly clear that the antitrust laws were not designed eliminate bidding processes where the party soliciting the bids predetermined the outcome.  "[O]ther laws [besides the Sherman Act], for example, unfair competition laws, business tort laws, or regulatory laws, provide remedies for various competitive practices thought to be offensive to proper standards of business morality."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) (internal

quotation marks omitted); *see also JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Cnty. of Montrose*, 754 F.3d 824, 828–31, 835–36 (10th Cir. 2014) (Holmes, J., concurring); *id.* at 858 (Tymkovich, J., concurring).

In the same vein, the purpose of federal antitrust laws is to remedy harm to "competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). "[A] plaintiff can recover [under the antitrust laws] only if [its] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original). Here, USA Cricket solicited bids for "*a partner* to help capitalize on [America's] interest levels in [cricket] and, specifically, to construct, fund, launch and operate *the first* professional T20 cricket league . . . in the United States." (¶ 71 (internal quotation marks omitted; emphasis added).) Combined with Plaintiff's allegation that "ICC recognition is crucial for any professional cricket league to be viable and internationally recognized" (¶ 32), it is clear that USA Cricket was offering a monopoly to whichever bidder prevailed during the RFP process. Thus, Plaintiff's ultimate goal is to hold the monopoly that USA Cricket granted to ACE. Being deprived of that monopoly is not something the antitrust laws were designed to remedy. *JetAway*, 754 F.3d at 838 (Holmes, J., concurring) ("the mere fact that one monopolist is able to successfully replace another does not harm competition and, therefore, does not effect an antitrust injury"); *id.* at 855–56 (Tymkovich, J., concurring) (agreeing that "merely substitut[ing] one monopoly for another" is not an injury redressable by antitrust laws).[7] Thus, Congress has not

---

[7] Plaintiff insists that it "has not claimed that [the] relevant market can sustain only a single [ICC-sanctioned T20 league], and, to the extent that Defendants make that claim, [Plaintiff] has not had an opportunity to engage in discovery to evaluate it." (ECF No. 64 at 38–39 (citations omitted).) This is beside the point. Whether or not the United States can sustain

"loosen[ed] the strictures of the redressability prong," *Summers*, 555 U.S. at 497, in the antitrust context, and especially not under the circumstances presented here.

The only prospective relief this Court might award that would certainly remedy Plaintiff's injury is to order USA Cricket to accept Plaintiff's bid instead of ACE's—but this Court has no power to make such an award, and Plaintiff does not request it anyway. And assuming the viability of a mere "procedural right" to a fair shot at winning the bidding war, the only prospective relief this Court might award that would guarantee that right is to order USA Cricket to redo the bidding—but this Court has no power to require that, and, again, Plaintiff does not request it in any event.

So the Court is left with Plaintiff's request to enjoin Defendants from "taking any further action to support or implement their selection of a winner in connection with the corrupted RFP Bid Process." (ECF No. 51 at 47–48.) If the Court were to enter such an injunction, effectively vacating the RFP award, USA Cricket would remain free to unilaterally invite ACE to develop the T20 league, and Plaintiff would be left just as empty-handed as before.

Perhaps Plaintiff means to head off this outcome through its requests that the Court enjoin Defendants from "excluding [Plaintiff] from, or failing to give objective and unbiased consideration to [Plaintiff] in, any current or future selection process," and "using unfair practices in any selection process or implementation of their programs in connection with a professional T20 cricket league in the U.S." (*Id*. at 48.) More

---

more than one cricket league (of any type, ICC-sanctioned or not), USA Cricket seeks only *one* partner, with the intent to develop *one* league. Plaintiff wants to be that sole partner, just as Global wanted to be USACA's sole partner. (*See* ¶ 41 (Global negotiated with USACA to create "*the only* USACA sanctioned and ICC approved professional T20 league in the United States" (internal quotation marks omitted; emphasis added))).

specifically, perhaps Plaintiff chose the phrase "selection process" to cover all possible methods of selecting a partner to establish a T20 league, including a unilateral invitation. But Plaintiff nowhere makes this explicit, nor cites any authority giving the Court power to enter an injunction to "give Plaintiff another look before making any final decision." Even if the Court had such power, redressability would still be lacking because "another look" is no more than that—and Plaintiff could still be left empty-handed in the end.

In sum, there is no prospective relief this Court has power to order that would remedy Plaintiff's alleged injury. Accordingly, Plaintiff lacks Article III standing to bring its federal antitrust claims.

      2.    <u>Loose Ends</u>

The Court must address two additional issues to ensure itself that Article III standing does not exist here.

      a.    *Article III Standing Through Retrospective Relief*

Late in the complaint, Plaintiff inserts an unelaborated allegation that the allegedly corrupt RFP process "allowed others to take business from [Plaintiff]—business that [Plaintiff] would have competed fairly for *and secured* if it were competing on a legitimate playing field." (¶ 134 (emphasis added).) Defendants' motion challenges this allegation as a "feint[]" that is "fatally" contradicted by Plaintiff's earlier concession that "'it was not guaranteed to be selected as a commercial business partner of USA Cricket and the ICC.'" (ECF No. 56 at 20 (quoting ¶ 7).) Plaintiff's 40-page response brief entirely ignores this attack. In fact, Plaintiff does not cite ¶ 134 for any purpose. (*See generally* ECF No. 64.) The Court thus deems Plaintiff to have forfeited any argument that a business opportunity which was certainly lost is a

monetary injury traceable to Defendants' conduct and redressable through a money judgment—therefore creating Article III standing.[8]

b.    *"Bid-Rigging"*

In reviewing Plaintiff's allegations, one passingly familiar with antitrust concepts might think of the term "bid-rigging."  Bid-rigging, however, is the sort of antitrust claim that USA Cricket could have brought against bidders in the RFP process if those bidders (such as ACE and Plaintiff) had conspired amongst themselves regarding the bids each would submit, *e.g.*, to ensure that no one offered more than a certain amount of compensation to USA Cricket.  *See United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989) ("Any agreement between competitors pursuant to which contract offers are to be submitted or withheld from a third party constitutes bid rigging [and is] *per se* violative of 15 U.S.C. [§] 1.").

In a rhetorical passage, Plaintiff accuses Defendants of "rigging competition"—an allegation meant to create an ironic contrast between international cricket's commitment to fair play on the pitch and lack of fair play in business dealings.  (¶¶ 1–3.)  But Plaintiff never actually accuses Defendants of bid-rigging.  Plaintiff instead describes Defendants' conduct as "sham bidding."  (¶ 122; *see also* ¶ 156(b); ECF No. 64 at 19.) Plaintiff's choice of words is somewhat surprising.  "Sham bidding" is the name used by one decision from this District to distinguish antitrust-prohibited bid-rigging from antitrust-neutral allegations that the party soliciting the bid did not conduct the bid process fairly.  *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1089–90 (D. Colo. 2012) (citing *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575

---

[8] Even if Plaintiff had made such an argument, such damages do not state an antitrust injury, as explained above.

F.2d 440 (3d Cir. 1978)).  By invoking the term "sham bidding," Plaintiff all but admits that the Court can provide no remedy for the injury Plaintiff alleges.

*  *  *

For the foregoing reasons, Counts 1–2 must be dismissed for lack of Article III subject matter jurisdiction.

## B.    State-Law Claims (Counts 3–8)

Plaintiff's state-law claims are grounded in the same theory underlying the federal antitrust claims, namely, that Plaintiff has been "procedurally" injured by the allegedly corrupt bidding process.  Thus, these claims also fail for lack of Article III standing, unless the relevant state laws grant rights and remedial powers not available under federal antitrust law (Plaintiff has not established that they do).  But even if Plaintiff has Article III standing under one or more of its state-law claims (such as a straightforward claim for damages under the contractual interference claim, Count 7), another jurisdictional problem prevents the Court from reaching the merits of those claims.

Due to the Article III infirmity in Counts 1 and 2, the Court has no original jurisdiction over the federal antitrust claims.  Yet they are the only claims Plaintiff pleads that arise under federal law.  *See* 28 U.S.C. § 1331.  Accordingly, the Court can exercise jurisdiction over the state-law claims only if Plaintiff shows that diversity jurisdiction exists under 28 U.S.C. § 1332.  *See Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991) ("The party seeking the exercise of jurisdiction in his favor must allege in his pleading the facts essential to show jurisdiction." (internal quotation marks omitted)); *see also Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 829 (1989) ("When a plaintiff sues more than one defendant in a diversity action,

20

the plaintiff must meet the requirements of the diversity statute for *each* defendant or face dismissal." (emphasis in original)).[9]

As relevant here, § 1332 requires that the parties be "citizens of different States." 28 U.S.C. § 1332(a)(1).  When one of the parties is an LLC—as Plaintiff is—then the plaintiff fails to plead facts sufficient to show diversity unless the plaintiff pleads the citizenship of all the LLC members and shows that no member is a citizen of the same state as any defendant.  *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1237-1238 (10th Cir. 2015) (an LLC takes the citizenship of all its members; "only those state-created entities that are corporations, in the traditional understanding of that word, will be treated as a person for purposes of diversity jurisdiction").  If the LLC members are themselves non-corporate business entities (other LLCs, LLPs, etc.), then the plaintiff must examine the members' members until the plaintiff "bottoms out" at a natural person or a corporation.  The citizenship of those natural persons and corporations is what counts in the diversity analysis.

Plaintiff does not plead the necessary allegations.  As to itself, Plaintiff alleges only that it is a Delaware LLC with its principal place of business in Las Vegas, Nevada. (¶ 9.)  Those facts would be relevant if Plaintiff was a corporation, but it is not.  More importantly, Plaintiff entirely fails to plead the citizenship of its LLC membership, and so Plaintiff cannot establish that it is *not* a citizen of a state in which a defendant is

---

[9] To be clear, the federal antitrust claims did not open the door to supplemental jurisdiction over the state-law claims.  Supplemental jurisdiction embraces "all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  *If* Plaintiff's federal antitrust claims had stated an Article III case or controversy, *then* the Court would have had original jurisdiction over them (through Article III and 28 U.S.C. § 1331).  But, as to those claims, it turns out that this Court has only ever had "jurisdiction to determine its own jurisdiction."  *United States v. Ruiz*, 536 U.S. 622, 628 (2002).  It has never had original jurisdiction, and so it cannot exercise supplemental jurisdiction.

organized or domiciled.  For this reason, Counts 3–8 must be dismissed without prejudice for lack of subject matter jurisdiction.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendants' Joint Motion to Dismiss (ECF No. 56) is GRANTED;

2.    Counts 1–2 of the Corrected Complaint and Jury Demand (ECF No. 51) are DISMISSED WITHOUT PREJUDICE for lack of Article III jurisdiction; and

3.    Counts 3–8 of the Corrected Complaint and Jury Demand (ECF No. 51) are DISMISSED WITHOUT PREJUDICE for lack of Article III jurisdiction and for lack of statutory subject matter jurisdiction.

Dated this 12th day of March, 2020.

BY THE COURT:

_____
William J. Martínez
United States District Judge